## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SATÉLITES MEXICANOS, S.A. DE C.V. *et al.*,[1] | Case No. 11-[_____] (___) |
| Debtors. | (Joint Administration Requested) |

## MOTION OF THE DEBTORS PURSUANT TO SECTIONS 105, 361, 362, 363 AND 507 OF THE BANKRUPTCY CODE (I) AUTHORIZING THE DEBTORS' USE OF CASH COLLATERAL ON AN INTERIM AND FINAL BASIS, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION SECURED PARTIES, (III) SCHEDULING A PRELIMINARY AND FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001, AND (IV) APPROVING NOTICE PROCEDURES

Satélites Mexicanos, S.A. de C.V. ("**Satmex**"), Alterna'TV Corporation ("**Alterna'TV**") and Alterna'TV International Corporation ("**Alterna'TV International**"), the debtors and debtors in possession (each, a "**Debtor**" and collectively, the "**Debtors**") in the above-captioned Chapter 11 Cases, pursuant to Sections 105, 361, 362, 363 and 507 of Title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), hereby file this motion (the "**Motion**") requesting, among other things, (a) authorization and approval of this Court for the use of Cash Collateral (defined below) on an interim and final basis, (b) to provide adequate protection, pursuant to Sections 361 and 363 of the Bankruptcy Code, to the Prepetition Secured Parties (as defined below) on account of any diminution in the value of the Prepetition Secured Parties' interests in the Prepetition

---

[1] The Debtors in these Chapter 11 Cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Satélites Mexicanos, S.A. de C.V. (0653); Alterna'TV Corporation (2940); and Alterna'TV International Corporation (4784).

Collateral (defined below); (c) that this Court schedule a preliminary hearing (the "**Preliminary Hearing**") on this Motion to consider entry of the Interim Order (a copy of which is attached hereto as **Exhibit A**), pending the Final Hearing (defined below) and thereafter schedule a Final Hearing to consider entry of the Final Order (defined below); and (d) establishing notice procedures in respect of the Final Hearing. In support of this Motion, the Debtors respectfully represent as follows:

## Status of the Case and Jurisdiction

1.     On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2.     The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.     The statutory predicates for the relief requested are Sections 105, 361, 362, 363 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2.

## Background

5.     Prior to the Petition Date, the Debtors solicited votes on the *Joint Prepackaged Plan of Reorganization of Satélites Mexicanos, S.A. De C.V., et al. Under Chapter 11 of the Bankruptcy Code* (the "**Plan**") through the *Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization of Satélites Mexicanos, S.A. De C.V., Alterna'TV Corporation, and Alterna'TV International Corporation Under Chapter 11 of the Bankruptcy*

*Code* (the "**Disclosure Statement**") distributed in accordance with Sections 1125 and 1126(b) of the Bankruptcy Code.[2]

6.      The Debtors are significant providers of fixed satellite services ("**FSS**") in the Americas, with coverage to more than 90% of the population of the Americas, including more than 45 nations and territories. As one of only two privately-managed FSS providers based in Latin America, the Debtors have designed, procured, launched, and operated three generations of satellites during a period of more than 25 years. Their current fleet is comprised of three satellites in highly attractive, contiguous orbital slots, which enables the Debtors' customers to effectively serve the entire coverage footprint utilizing a single satellite connection. The Debtors also provide Latin American television programming to the United States. The Debtors' industry is highly regulated and the Debtors' are dependent upon certain telecommunication concessions from the Mexican government.

7.      As of February 28, 2011, the Debtors' outstanding secured indebtedness consisted of approximately $238.2 million in aggregate outstanding principal amount of First Priority Notes and $201.9 million in aggregate outstanding principal amount of Second Priority Notes, each issued by Satmex. Each of the First Priority Notes and the Second Priority Notes are guaranteed by substantially all of the assets of Alterna'TV and Alterna'TV International (and certain non-debtor affiliates), and secured by a lien on substantially all of the assets of the Debtors. The relative rights of the holders of First Priority Notes (as defined below) and holders of Second Priority Notes (as defined below) are governed by the Intercreditor Agreement dated

---

[2] Unless otherwise defined, capitalized terms shall have the meaning ascribed to them in the *Declaration of Patricio E. Northland in Support of Debtors' Chapter 11 Petitions and Request for First Day Relief*, which is being filed contemporaneously with this Motion (the "**Northland Declaration**"). Please see the Plan and Disclosure Statement for more details regarding the Plan and the transactions contemplated therein.

as of November 30, 2006. The Debtors also have certain unsecured debt on which they are generally current as of the Petition Date.

8.     In 2010 and 2011, the Debtors negotiated a prepackaged plan of reorganization that involves raising approximately $325 million of new financing through a high-yield secured debt issuance and $96.25 million of new equity investment through a Rights Offering for direct and indirect equity in Reorganized Satmex. The Debtors successfully obtained prepetition commitments for both sources of funding, subject to certain conditions. The funds raised from the debt and equity issuances will be used to retire the First Priority Notes, fund the completion of replacement satellite(s), and provide working capital for the reorganized Debtors. In full satisfaction of their claims, the holders of Second Priority Notes will receive direct or indirect equity in Reorganized Satmex, and the option to participate in the Rights Offering. As an alternative, the holders of Second Priority Notes may elect to receive cash only under a liquidity option, where the holder will receive 38 cents for each dollar in principal amount of Second Priority Note claims (including accrued paid-in-kind interest through the earlier of the Effective Date and May 31, 2011). The Debtors anticipate paying all other claims in the ordinary course.

9.     Satmex currently has two classes and three series of common stock, all of which is currently held by two Mexican trusts (collectively, the "**Trusts**"). The trust structure is not uncommon in Mexico and generally allows for foreign investors to invest in Mexican businesses and still meet Mexico's restrictions on foreign investment. Alterna'TV and Alterna'TV International are both wholly-owned subsidiaries of Satmex.

10.     In order to effectuate the transactions under the Plan, Holdsat Mexico S.A.P.I. de C.V. ("**Mexico Holdings**") and Satmex International B.V. ("**Satmex B.V.**"), a wholly-owned subsidiary of Satmex Investment Holdings GP Ltd. and Satmex Investment Holdings L.P.

(collectively, "**Investment Holdings**"), will purchase 100% of the current equity in Satmex for a purchase price of up to $6.25 million (subject to the satisfaction of certain conditions), pursuant to the Share Purchase Agreement dated December 22, 2010 (as amended, the "**Share Purchase Agreement**"). The beneficial owners of the purchasers under the Share Purchase Agreement are certain holders of Second Priority Notes. The purchase price for the equity will be funded in part by the proceeds of the Rights Offering, and the share purchase transaction will close before the Plan goes effective. Alterna'TV and Alterna'TV International will both remain wholly-owned subsidiaries of Satmex after confirmation of the Plan.

11.     Holders of Second Priority Notes representing more than 66 2/3% of the outstanding principal amount of Second Priority Notes entered into a Restructuring Support Agreement with the Debtors on December 22, 2010 (the "**SPN Restructuring Support Agreement**"). Holders of First Priority Notes representing more than 66 2/3% of the outstanding principal amount of First Priority Notes entered into a Restructuring Support Agreement with the Debtors on March 23, 2011 (the "**FPN Restructuring Support Agreement**," together with the SPN Restructuring Support Agreement, the "**Restructuring Support Agreements**"). Also, on January 13, 2011, certain beneficial holders of units representing in the aggregate a majority of the trust interests in one of the Trusts (collectively, the "**Supporting Unitholders**") entered into agreements (collectively, the "**Unitholder Support Letters**") undertaking to support the transactions described in the SPN Restructuring Support Agreement.

12.     On March 8, 2011, the Debtors served the Disclosure Statement and solicited votes from the First Priority Noteholders and Second Priority Noteholders. On March 25, 2011, the Debtors served the Supplement to the Disclosure Statement to announce their entry into the

FPN Restructuring Support Agreement. The Chapter 11 Cases are required to implement the restructuring because the Second Priority Noteholders are impaired under the Plan. The Debtors believe that the Plan provides First Priority Noteholders with all amounts due to them under the First Priority Indenture. The Debtors have elected to treat First Priority Noteholders as an unimpaired class that is conclusively presumed to have accepted the Plan. However, in order to facilitate the confirmation and consummation of the Plan and to avoid any doubt that the proposed treatment leaves the First Priority Noteholders unimpaired or is otherwise acceptable to them, the Debtors are soliciting votes from the First Priority Noteholders. The Debtors believe that the Plan, which has been negotiated with representatives of the First Priority Noteholders, Second Priority Noteholders, the Series B Directors of Satmex, and certain equity holders of Satmex is the best mechanism for ensuring a successful restructuring of their current debts and providing them with the liquidity to succeed in the long-term.

13.     Both the First Priority Noteholder and Second Priority Noteholder classes have voted to accept the Plan under the standards of 11 U.S.C. § 1126. The Debtors have requested that the Court confirm their "prepackaged" Plan approximately one month from the Petition Date.

14.     A more detailed factual background of the Debtors' businesses and operations, as well as the events precipitating the commencement of these Chapter 11 Cases, is fully set forth in the Northland Declaration, filed contemporaneously herewith and incorporated herein by reference.

## The Debtors' Prepetition Indebtedness

15.     As of the Petition Date, the Debtors' outstanding indebtedness consisted of the following (collectively, the "**Prepetition Secured Obligations**"):

(i) The **"Prepetition First Priority Obligations"**: The First Priority Senior Secured Notes due 2011 (the **"First Priority Notes"**), issued pursuant to an Indenture, dated as of November 30, 2006, including the Amendment and Limited Waiver Agreement dated May 7, 2010, (as amended, supplemented or otherwise modified, the **"First Priority Indenture"**), among Satmex as primary obligor, Alterna'TV and Alterna'TV International along with certain non-Debtors as guarantors (the **"First Priority Guarantors"**), and US Bank National Association (as successor to HSBC Bank USA, National Association), as First Priority Indenture Trustee (the **"First Priority Indenture Trustee"**); and

(ii) The **"Prepetition Second Priority Obligations"**: The 10 1/8% Second Priority Senior Secured Notes due 2013 (the **"Second Priority Notes"**), issued pursuant to an Indenture, dated as of November 30, 2006, including the Amendment and Limited Waiver Agreement dated May 7, 2010, (as amended, supplemented or otherwise modified, the **"Second Priority Indenture,"** and together with the First Priority Indenture, the **"Indentures"**), among Satmex as primary obligor, Alterna'TV and Alterna'TV International along with certain non-Debtors as guarantors (the **"Second Priority Guarantors"**), and Wells Fargo Bank, National Association, as Second Priority Indenture Trustee (the **"Second Priority Indenture Trustee"** and together with the First Priority Indenture Trustee, the **"Indenture Trustees"**).

16. As of the Petition Date, the Debtors were jointly and severally liable to the First Priority Noteholders, without defense, counterclaim or offset, in the aggregate principal amount of approximately $238,236,500 in respect of the First Priority Notes, plus accrued and unpaid interest thereon and unpaid fees, expenses and other obligations due and payable in accordance with the terms of the First Priority Indenture, the First Priority Collateral Trust Agreement and supporting documents (collectively, the **"First Priority Documents"**).

17. As of February 28, 2011, the Debtors were jointly and severally liable to the Second Priority Noteholders, without defense, counterclaim or offset, in the aggregate principal amount of approximately $201,892,758 in respect of the Second Priority Notes, plus accrued and unpaid interest thereon and unpaid fees, expenses and other obligations due and payable in accordance with the terms of Second Priority Indenture, the Second Priority Collateral Trust

Agreement and supporting documents (collectively, the "**Second Priority Documents**" and together with the "**First Priority Documents**," the "**Note Documents**").

18.     Pursuant to the First Priority Collateral Trust Agreement and First Priority Security Documents (as defined in the First Priority Indenture), the Prepetition First Priority Obligations are secured by, among other things, a first priority lien (the "**First Priority Lien**") on all of the Debtors' assets or other property, including but not limited to all assets and other property of whatever nature, whether real, personal, or mixed, tangible or intangible, now owned or existing or hereafter acquired or arising, and including but not limited to all assets and other property, and products and proceeds thereof (collectively, the "**Prepetition Collateral**"). Pursuant to the Second Priority Collateral Trust Agreement and Second Priority Security Documents (as defined in the Second Priority Indenture), the Prepetition Second Priority Obligations are secured by, among other things, a second priority lien (the "**Second Priority Lien**" and together with the First Priority Lien, the "**Existing Liens**") on the Prepetition Collateral.

**The Intercreditor Agreement**

19.     Saxmex, the Indenture Trustees, HSBC Bank USA, National Association, as Collateral Trustee (the "**First Priority Collateral Trustee**") pursuant to the First Priority Collateral Trust Agreement dated November 30, 2006 (the "**First Priority Collateral Trust Agreement**"), and Wells Fargo Bank, National Association, as Collateral Trustee (the "**Second Priority Collateral Trustee**" and together with the First Priority Collateral Trustee, the "**Collateral Trustees**") pursuant to the Second Priority Collateral Trust Agreement dated November 30, 2006 (the "**Second Priority Collateral Trust Agreement**"), entered into an Intercreditor Agreement dated as of November 30, 2006 (as amended, supplemented or

otherwise modified, the "**Intercreditor Agreement**"), which, among other things, provides that

the ranking and priority of the indebtedness arising under the Indentures is as follows: first, the

First Priority Notes; and second, the Second Priority Notes. A copy of the Intercreditor

Agreement is attached hereto as **Exhibit C**. The Intercreditor Agreement also provides that liens

and security interests in collateral securing the First Priority Notes are senior in priority to liens

and security interests in collateral securing the Second Priority Notes.

20. In addition, the holders of Second Priority Notes (the "**Second Priority**

**Noteholders**") agreed to certain limitations in the Intercreditor Agreement on their ability to

object to the use of cash collateral and seek adequate protection in the event that the Debtor

Satmex files for bankruptcy protection. Among other things, the Intercreditor Agreement

provides at Section 6.1(a) that if the Debtor Satmex files for bankruptcy protection, and the First

Priority Collateral Trustee desires to permit the use of cash collateral as defined in Section

363(a) of the Bankruptcy Code, then the Second Priority Collateral Trustee and the Second

Priority Indenture Trustee, each on behalf of itself and the Second Priority Noteholders, waive

any right to object to such use of cash collateral except an objection "solely on the basis that

more favorable financing terms are available to [Satmex] at such time." The Intercreditor

Agreement also provides in Section 6.3(a) that the Second Priority Collateral Trustee and the

Second Priority Indenture Trustee, each on behalf of itself and the Second Priority Noteholders,

waive their rights to seek adequate protection under the Bankruptcy Code, provided however,

that they can seek a junior lien as adequate protection only if the holders of First Priority Notes

(the "**First Priority Noteholders**" and, together with the Second Priority Noteholders, the

"**Prepetition Secured Noteholders**") are granted a lien as adequate protection and, in that

instance, the adequate protection that the Second Priority Noteholders can seek is limited to "a

junior Lien on the same assets with respect to which a United States bankruptcy court has granted a lien as Adequate Protection to secure the First Priority Obligations so long as . . . such junior Lien is subject to the same Lien subordination arrangements as set forth in this Agreement." The First Priority Indenture Trustee, the First Priority Collateral Trustee, and the First Priority Noteholders shall collectively be referred to as the "**First Priority Secured Parties**" and the Second Priority Indenture Trustee, the Second Priority Collateral Trustee, and the Second Priority Noteholders shall collectively be referred to as the "**Second Priority Secured Parties,**" and, together with the First Priority Secured Parties, the "**Prepetition Secured Parties.**"

## The Amendment and Limited Waiver Agreement

21.    On or about May 7, 2010, the Debtors and certain other non-Debtor guarantors entered into an Amendment and Limited Waiver Agreement (the "**Amendment**") with the Indenture Trustees, the Collateral Trustees, certain First Priority Noteholders (holding a majority of the First Priority Notes), and certain Second Priority Noteholders (holding a majority of the Second Priority Notes). A copy of the Amendment is attached hereto as **Exhibit D**. The Amendment was intended to modify the Indentures to allow for Satmex to enter into a contract to construct and deliver a new satellite, which was necessary because the failure to do so would otherwise have caused defaults under the Indentures. As consideration for waiving the defaults and other consideration set forth therein, the Amendment increased the interest rate to be provided to the First Priority Noteholders under certain circumstances.

22.    Section 6.5(a) of the Amendment provided that if Satmex (referred to therein as the "**Company**") was to file for bankruptcy protection, subject to approval of the bankruptcy

court, the following payments would constitute adequate protection payments with respect to the Debtors (all defined terms are from the Amendment, which is attached hereto as Exhibit "D"):

> (1) the First Priority Securities shall accrue interest at the applicable non-default interest rate in effect at such time pursuant to the First Priority Documents, including this [Amendment] and any supplemental indenture related thereto, (2) the Company shall pay the reasonable and customary fees and documented out-of-pocket expenses of one U.S. lead counsel, one U.S. local Delaware counsel and one Mexican counsel to the Consenting First Priority Holders and the reasonable and customary fees and expenses of the First Priority Indenture Trustee and the First Priority Collateral Trustee, including the fees and expenses of legal counsel, and (3) the Company shall provide other customary protections as negotiated between the Company and the First Priority Holders before an Insolvency Proceeding.

In addition, Satmex acknowledged in the Amendment that the First Priority Noteholders reserved their rights to seek payment of fees and expenses of a financial advisor to the First Priority Noteholders prior to or on or after the commencement of a bankruptcy proceeding by Satmex, which Satmex reserved its rights to oppose.

23.     In addition, Section 6.5(b) of the Amendment provided that if Satmex (referred to therein as the "**Company**") was to file for bankruptcy protection, subject to approval of the bankruptcy court, the following payments would constitute adequate protection payments with respect to the Debtors (all defined terms are from the Amendment, which is attached hereto as Exhibit "D"):

> (1) the Second Priority Securities shall accrue interest at the applicable non-default interest rate in effect at such time pursuant to the Second Priority Documents, including this [Amendment] and any supplemental indenture related thereto, (2) the Company shall pay the reasonable and customary fees and documented out-of-pocket expenses of one U.S. counsel, one U.S. local Delaware counsel and one Mexican counsel to the Consenting Second Priority Holders and the reasonable and customary fees and expenses of the Second Priority Indenture Trustee and the Second Priority Collateral Trustee, including the fees and expenses of legal counsel, and (3) the Company shall provide other customary

protections as negotiated between the Company and the Second Priority Holders before an Insolvency Proceeding.

### The Second Priority Noteholder Restructuring Support Agreement

24.     On or about December 22, 2010, certain holders of Second Priority Notes representing more than 66-2/3% of the Second Priority Notes (the "**Supporting Second Priority Noteholders**") executed the SPN Restructuring Support Agreement, by which they agreed, in return for certain consideration, among other things, to support the Plan and restructuring transactions described therein and to forbear from exercising certain rights and remedies under the Second Priority Indenture. The SPN Restructuring Support Agreement provides in Sections 8(m), 8(n) and 8(o) that the SPN Restructuring Support Agreement may be terminated by the Supporting Second Priority Noteholders if certain deadlines for the entry of the Interim Order and Final Order are not met or if the Final Order were to be vacated, amended or modified without the consent of the Supporting Second Priority Noteholders. The definitions section of the SPN Restructuring Support Agreement provides that any "Cash Collateral Order" entered in these cases shall be "in form and substance consistent with the terms of the [Amendment] or as otherwise acceptable to the Required Supporting SPN Holders." A copy of the SPN Restructuring Support Agreement is attached hereto as **Exhibit E.**

### The First Priority Noteholder Restructuring Support Agreement

25.     On or about March 23, 2011, the Debtors entered into the FPN Restructuring Support Agreement the FPN Restructuring Support Agreement with certain holders of First Priority Notes representing more than 66-2/3% of the First Priority Notes (the "**Supporting First Priority Noteholders**"),[3] by which they agreed, among other things, to support the Plan and

---

[3]     Under the FPN Restructuring Support Agreement, the Required Supporting FPN Holders (the "Required Supporting FPN Holders") are defined to mean the Supporting First Priority Noteholders holding more than 66-2/3% of the aggregate principal amount of the First Priority Notes held by all of the Supporting First Priority

restructuring transaction contained therein and to forbear from exercising certain rights and remedies under the First Priority Indenture. A copy of the FPN Restructuring Support Agreement is attached hereto as **Exhibit F**. In return for such support for the Plan, the FPN Restructuring Support Agreement provided the Supporting First Priority Noteholders, among other things, with the FPN Buy-Out (as defined in the FPN Restructuring Support Agreement, Page 1). The FPN Buy-Out is an integral part of the restructuring and recapitalization of the Debtors that is to be implemented through the Plan. The FPN Buy-Out provides, among other things, for satisfaction of the claims of the First Priority Noteholders through a cash payment on the Effective Date to the First Priority Indenture Trustee of the full outstanding principal amount and all accrued and unpaid interest, including any unpaid interest accruing after the Petition Date, at the applicable non-default interest rate of 12% per annum, without penalty or premium. The Plan further provides for the payment of all fees and expenses of the First Priority Indenture Trustee, the First Priority Collateral Trustee, and the Ad Hoc Committee of First Priority Noteholders, including the reasonable fees and expenses of counsel.

26. Significantly, by the FPN Restructuring Support Agreement, the Supporting First Priority Noteholders consented to the adequate protection provided therein, which is the same adequate protection proposed in the Orders. Section 4 of the FPN Restructuring Support Agreement requires the Debtors to "seek the entry of a Cash Collateral Order providing the Agreed Adequate Protection." The term "Cash Collateral Order" is defined therein as:

> an interim or final order entered by the Bankruptcy Court, authorizing the Debtors to use cash collateral (as such term is

---

Noteholders; provided, that the aggregate principal amount of First Priority Notes held by any Supporting FPN Holder then in breach of the FPN Restructuring Support Agreement shall not be included in the calculation of Required Supporting FPN Holders. Where this Motion or the Orders provide for or discuss the action, consent, or approval of the Supporting First Priority Noteholders, such action, consent, or approval shall be deemed to have been accomplished or granted upon the taking of such action or granting of such consent or approval by the Required Supporting FPN Holders.

defined in section 363 of the Bankruptcy Code) and granting adequate protection to the First Priority Noteholders and the Second Priority Noteholders, which shall include the Agreed Adequate Protection or otherwise be satisfactory in form and substance to the Supporting FPN Holders.

The term "Agreed Adequate Protection" is defined therein as:

(a) *Accrual of interest.* The First Priority Notes shall accrue interest after the Petition Date at the applicable non-default interest rate of 12% per annum in effect at such time pursuant to the First Priority Documents.

(b) *Current payment of interest.* On the first Business Day following the entry of the interim Cash Collateral Order by the Bankruptcy Court, the Company shall make an interest payment on the First Priority Notes in cash in the amount of all accrued but unpaid interest at the applicable non-default rate of 12% per annum through the date of the entry of such order (the "Order Entry Date"). During the pendency of the Chapter 11 Cases, each Interest Period (as defined in the First Priority Indenture) under the First Priority Notes shall be a calendar month, and the Company shall pay interest on a current basis at the applicable non-default rate of 12% per annum on the applicable Interest Payment Date (as defined in the First Priority Indenture) for each such Interest Period, beginning with the last calendar day of the month in which the interim Cash Collateral Order is entered (or the next succeeding Business Day if the last calendar day of such month falls on a Saturday, Sunday or legal holiday).

(c) *Payment of fees and expenses.* The Company shall pay the reasonable and customary fees and documented out-of-pocket expenses of the FPN Professionals and the reasonable and customary fees and expenses of the First Priority Indenture Trustee and the First Priority Collateral Trustee, including the reasonable fees and expenses of legal counsel, collectively for services rendered before and after the Petition Date.

(d) *Replacement liens.* The First Priority Collateral Trustee shall receive replacement liens on all First Priority Collateral acquired by the Debtors after the Petition Date to secure any claim for the diminution in the value of its collateral; provided that such replacement liens shall be subject to customary carve-outs and shall not extend to the various escrow amounts under the Plan.

(e) *Superpriority claims.* To the extent that the First Priority Indenture Trustee is not paid in full as contemplated herein, the First Priority Indenture Trustee shall receive an allowed administrative claim with priority over all other administrative claims in the Chapter 11 Cases (subject to a customary carve-out for U.S. Trustee fees and fees and expenses of the Company's professionals and the professionals hired by any unsecured creditors' committee) in the amount of any diminution in value of the First Priority Collateral.

(f)     *506(c) waiver.* Upon the entry of the final Cash Collateral Order, no costs or expenses chargeable or alleged to be chargeable against the First Priority Collateral under section 506(c) of the Bankruptcy Code shall be incurred in these proceedings without the consent of the Supporting FPN Holders and the First Priority Collateral Trustee.

27.     Similar to the SPN Restructuring Support Agreement, the FPN Restructuring Support Agreement provides in Sections 8(i), 8(j) and 8(k) that the FPN Restructuring Support Agreement may be terminated by the Supporting First Priority Noteholders if certain deadlines for the entry of the Interim Order and Final Order are not met or if the Final Order were to be vacated, amended or modified without the consent of the Required Supporting First Priority Noteholders.

## Negotiations with Prepetition Noteholders

28.     Before the Petition Date, the Debtors, Counsel for the Ad Hoc Committee of First Priority Noteholders[4] (on behalf of the Ad Hoc Committee of First Priority Noteholders and the Supporting First Priority Noteholders, which included both the members of the Ad Hoc Committee of First Priority Noteholders and additional First Priority Noteholders), and counsel for the Supporting Second Priority Noteholders reached a consensual agreement on the forms of adequate protection and the use of cash collateral, as such term is defined in Section 363 of the Bankruptcy Code, in which the Prepetition Secured Parties have an interest (the "**Cash Collateral**"), pursuant to the terms and conditions of the proposed Interim Order and the budget (as such budget may be modified from time to time as set forth herein and in the proposed Orders, the "**Budget**"). A copy of the Budget is attached hereto as **Exhibit B**. Accordingly, the Supporting First Priority Noteholders (representing more than 66-2/3% of the First Priority

---

[4]     "**Ad Hoc Committee of First Priority Noteholders**" as used in this Motion means those First Priority Noteholders which formed an ad hoc committee. The individual members of the Ad Hoc Committee of First Priority Noteholders will be listed in full in the Plan Supplement to be filed in conjunction with the Plan. "**Counsel to the Ad Hoc Committee of First Priority Noteholders**" as used in this Motion means Dechert LLP, Galicia Abogados, S.C. and one Delaware local counsel selected by the Ad Hoc Committee of First Priority Noteholders.

Noteholders) and the Supporting Second Priority Noteholders (representing more than 66-2/3% of the Second Priority Noteholders) have consented to the Debtors' use of Cash Collateral, subject to the protections, terms and conditions provided for in the Orders and the Budget. In addition, the Indenture Trustees on behalf of all Prepetition Noteholders have provided their consent to the use of cash collateral and provisions of adequate protection through the Amendment.

### Summary of Relief Requested and Local Rule 4001-2 Disclosures

29.     The Debtors respectfully request that the Court:

(a)     immediately schedule and hold the Preliminary Hearing and enter an Interim Order pursuant to Sections 105, 361, 362, 363 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(b) and 9014, and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, authorizing the Debtors' use of Cash Collateral on an interim basis and granting the adequate protection as set forth herein to the Prepetition Secured Parties;

(b)     during the Preliminary Hearing, schedule a final hearing on the Motion pursuant to Bankruptcy Rule 4001(b)(2) (the "**Final Hearing**"); and

(c)     following the Final Hearing, enter a final order granting the relief requested in this Motion on a final basis (the "**Final Order**" and, collectively with the Interim Order, the "**Orders**").

30.     The Debtors believe that all proceeds of the Prepetition Collateral are Cash Collateral of the Prepetition Secured Parties within the meaning of Section 363(a) of the Bankruptcy Code. In order to provide the Debtors with their consent for the use of Cash Collateral, the Indenture Trustees, the Ad Hoc Committee of First Priority Noteholders and the Supporting Second Priority Noteholders have requested, and the Debtors believe that such

parties are entitled to, adequate protection, pursuant to Sections 105, 361, 362 and 363(e) of the Bankruptcy Code, of their interest in the Prepetition Collateral, including the Cash Collateral, for any diminution in value of the Prepetition Collateral, including, without limitation, resulting from the use of Cash Collateral and the imposition of the automatic stay pursuant to Section 362(a) of the Bankruptcy Code.

31.     Pursuant to Bankruptcy Rule 4001(b) and Local Bankruptcy Rule 4001-2, the relevant details of the Interim Order and the adequate protection proposed to be granted therein are as follows:[5]

A.      Use of the Cash Collateral. The Debtors expect to use the Cash Collateral in accordance with the Budget, to: (i) continue operating their businesses while in Chapter 11, including paying their vendors, suppliers, service providers, utilities and other overhead in the ordinary course; and (ii) pay the costs and expenses of administering the cases including, without limitation, funding the professional and other fees and expenses associated with confirming and consummating the Plan.

B.      Provisions to be Highlighted Pursuant to Local Rule 4001-2. The following provisions listed in Local Rule 4001-2 are contained in the proposed Interim Order:

(i)     4001-2(a)(i)(B) - See Interim Order at Paragraphs C(i) through C(vi) and Paragraph 15, providing stipulations binding the Debtors, but providing that parties-in-interest, including any official committee appointed in the cases pursuant to Section 1102 of the Bankruptcy Code ("**Committee**"), shall have 21 days from the Petition Date (the "**Challenge Period**") to investigate and challenge the validity, perfection or amount of the Prepetition Notes. Shortening the periods set forth in Local Rule 4001-2(a)(i)(B) in the manner set forth above is justified here because of the nature and anticipated "fast-track" timing of the cases, specifically: (a) the Debtors have filed a pre-packaged Chapter 11 plan and are asking this Court to schedule the combined hearing to consider approving the adequacy of the disclosure statement and confirming the Plan within approximately thirty-five (35) days from the Petition Date, (b) the Debtors are requesting in another contemporaneously filed motion that this Court direct the United States Trustee to waive the convening of a meeting of creditors under Section 341(a) of the Bankruptcy Code, and (c) the Debtors intend to discuss with the United States Trustee delaying the

---

[5] This summary is qualified in all respects by the terms of the Interim Order. To the extent any provision herein is inconsistent with the terms of the Interim Order, the Interim Order shall control.

appointment of a Committee in the cases, pending the outcome of the Debtors' request for confirmation of the Plan. In addition, including this paragraph in the Interim Order is justified under the circumstances because the Prepetition Noteholders would not otherwise permit the Debtors to use the Cash Collateral (and the Debtors have no other unencumbered cash with which to fund the cases and confirm the Plan);

(ii)  4001-2(a)(i)(C) - See Interim Order at Paragraph 9, which provides a Section 506(c) waiver only upon entry of the Final Order, but not in the proposed Interim Order; and

(iii)  4001-2(a)(i)(D) - See Interim Order at Paragraph 4(d), which provide replacement liens as adequate protection on Avoidance Actions only upon entry of a Final Order, but not in the proposed Interim Order.

C.  <u>Other Material Terms and Adequate Protection</u>. If approved by the Court:

(i)  <u>Amount</u>. The Debtors may use Cash Collateral in the amounts set forth in, and otherwise in accordance with, the Budget and the Orders.

(ii)  <u>Interim Access to Cash Collateral</u>. The Debtors' interim authority to use Cash Collateral shall be subject in all respects to the Budget and shall continue at all times during the period between the date of entry of the Interim Order and the earliest to occur of (a) the date of entry of the Final Order; and (b) a Termination (as defined below) (the "**Interim Period**").

(iii)  <u>Shortening Challenge Periods</u>. Paragraph 15 of the Interim Order provides that parties-in-interest, including any Committee, shall have 21 days from the Petition Date to investigate and challenge the validity, perfection or amount of the Prepetition Notes.

(iv)  <u>Limited Use of Cash Collateral for Challenges</u>. Paragraph 6 of the Interim Order provides that nothing in the Interim Order shall authorize the Debtors to use Cash Collateral received after the Petition Date from the sale or disposition of assets, or other receipt of Cash Collateral, outside the ordinary course of business of the Debtors except as explicitly set forth in the Budget. No portion of the Prepetition Collateral (including any Cash Collateral generated by the Debtors after the Petition Date) shall be distributed by the Debtors in the form of an upstream dividend, intercompany loan, or any contribution or distribution except as expressly provided in the then applicable Budget. Notwithstanding anything to the contrary set forth in the Interim Order, the Cash Collateral may not be used: (a) in connection with or to finance any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) against any Prepetition Secured Party or seeking relief that would impair the rights and remedies of any Prepetition Secured Party under the Note Documents or the Interim Order, including, without limitation, for the

payment of any services rendered by the professionals retained by the Debtors or, if applicable, any Committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief that would impair the ability of any Prepetition Secured Party to recover on the Prepetition Secured Obligations or seeking affirmative relief against any Prepetition Secured Party related to the Prepetition Secured Obligations; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, any of the Existing Liens or the Prepetition Secured Obligations; or (iii) for monetary, injunctive or other affirmative relief against any Prepetition Secured Party or their respective Prepetition Collateral that would impair the ability of any Prepetition Secured Party to recover on the Prepetition Secured Obligations; (b) for objecting to or challenging in any way the claims, liens, or interests (including the Existing Liens and the Adequate Protection Liens) held by or on behalf of any Prepetition Secured Party related to the Prepetition Secured Obligations; (c) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any Prepetition Secured Party related to the Prepetition Secured Obligations or the Existing Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Existing Liens or any other rights or interests of any Prepetition Secured Party related to the Prepetition Secured Obligations or the Existing Liens; provided, however, that no more than $25,000.00 of the proceeds of the Prepetition Collateral may be used by any Committee, if appointed, solely to investigate the foregoing matters.

(v)     Adequate Protection for Prepetition Secured Parties: Paragraph 4 of the Interim Order provides that as adequate protection for the use of the Prepetition Secured Parties' Cash Collateral and any diminution in value of the Prepetition Collateral by virtue of valid, perfected, enforceable and non-avoidable liens or security interests from and after the Petition Date, the Debtors have agreed to grant the Prepetition Secured Parties the following adequate protection:

(a)     Accrual of Interest. (i) The First Priority Notes shall be paid interest from and after the Petition Date based upon the applicable non-default interest rate of 12% per annum; and (ii) the Second Priority Notes shall accrue interest from and after the Petition Date at the applicable non-default interest rate of 10 1/8%;

(b)     Current Payment of Interest on the First Priority Notes. On the first Business Day following the entry of the Interim Order, the Debtors shall make an interest payment on the First Priority Notes

in cash to the First Priority Indenture Trustee in the amount of all accrued but unpaid interest at the applicable non-default rate of 12% per annum through the date of the Interim Order. During the pendency of the Chapter 11 Cases, each Interest Period (as defined in the First Priority Indenture) shall be a calendar month, and the Debtors shall pay interest on a current basis at the applicable non-default rate of 12% per annum on the applicable Interest Payment Date (as defined in the First Priority Indenture) for each such monthly Interest Period, beginning with the last calendar day of April, 2011 (or the next succeeding Business Day if the last calendar day of such month falls on a Saturday, Sunday or legal holiday);

(c)     Payment of Fees and Expenses: (i) The Debtors shall promptly pay on a current basis the reasonable and customary fees and documented out-of-pocket expenses of Counsel to the Ad Hoc Committee of First Priority Noteholders and the reasonable and customary fees and documented expenses of the First Priority Indenture Trustee and the First Priority Collateral Trustee, including the reasonable and customary fees and documented expenses of legal counsel, without the necessity of further notice or filing of any application with this Court; and (ii) the Debtors shall promptly pay on a current basis the reasonable and customary fees and documented out-of-pocket expenses of counsel and the financial advisor to the Supporting Second Priority Noteholders and the reasonable and customary fees and documented expenses of the Second Priority Indenture Trustee and Second Priority Collateral Trustee, including the reasonable and customary fees and documented expenses of legal counsel, without the necessity of further notice or filing of any application with this Court;

(d)     Replacement Liens. (i) The First Priority Collateral Trustee, for the benefit of the First Priority Secured Parties, shall be granted, effective and perfected as of the Petition Date, a first priority replacement lien and additional lien on all assets and property of the Debtors of any kind or nature whatsoever, now owned or hereafter acquired by the Debtors, all proceeds, rents, products or profits thereof and all proceeds of such proceeds, rents, products and profits (all such assets and property, collectively, the "**Collateral**") to secure the claims of the First Priority Secured Parties, subject and subordinate only to (x) the Carve-Out (as defined below), and (y) existing liens and encumbrances that were senior to those of the Prepetition Secured Parties as of the Petition Date under applicable non-bankruptcy law and permitted pursuant to Section 4.16 of the First Priority Indenture, the First Priority Trust Agreement and the First Priority Security Documents, to the extent such liens and encumbrances are valid, binding,

enforceable, perfected and non-avoidable liens existing in the Prepetition Collateral as of the Petition Date (the "**Permitted Liens**," which shall not, for the avoidance of doubt, include the Existing Liens), to secure the claims of the First Priority Secured Parties for the diminution in the value of their interests in the Prepetition Collateral (the "**First Priority Adequate Protection Liens**"); and (ii) the Second Priority Collateral Trustee, for the benefit of the Second Priority Secured Parties, shall be granted, effective and perfected as of the Petition Date, a second priority replacement lien and additional lien on the Collateral, subject and subordinate only to (w) the First Priority Liens on the Prepetition Collateral, (x) the First Priority Adequate Protection Liens, (y) the Carve-Out and (z) Permitted Liens, to secure any claim of the Second Priority Secured Parties for the diminution in the value of their interests in the Prepetition Collateral (the "**Second Priority Adequate Protection Liens**" and, together with the First Priority Adequate Protection Liens, the "**Adequate Protection Liens**"); provided, that any exercise of remedies with respect to the Second Priority Adequate Protection Liens shall be subject to the terms and provisions of the Intercreditor Agreement. The Collateral shall include without limitation, but subject to the entry of the Final Order, the proceeds of the Debtors' claims and causes of action arising under Sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code (collectively, the "**Avoidance Actions**"). The Adequate Protection Liens (a) shall not be subject or subordinate to any lien that is avoided and preserved for the benefit of the Debtors and the Debtors' estates under Section 551 of the Bankruptcy Code or to any liens arising after the Petition Date and (b) except as expressly set forth herein, shall not be subordinated or made pari passu with any other lien or security interest under Sections 363 or 364 of the Bankruptcy Code or otherwise. Until payment in full of all of the Prepetition Secured Obligations (a) the Adequate Protection Liens shall remain valid and enforceable with the same continuing priority as described in the Interim Order, and (b) any guaranty executed in connection with the Indentures shall remain valid and continue to be in full force and effect;

(e)    <u>Perfection of Adequate Protection Liens</u>. The Interim Order shall be sufficient and conclusive evidence of the validity, perfection and priority of the Adequate Protection Liens without the necessity of filing or recording by any party any financing statement, mortgage, notice or other instrument or document otherwise required to be executed or filed under applicable non-bankruptcy law (collectively, "**Perfection Documents**"). Notwithstanding the foregoing, the First Priority Collateral Trustee and the Second Priority Collateral Trustee shall be authorized to file, as each

deems necessary or advisable, such Perfection Documents to perfect in accordance with applicable non-bankruptcy law or otherwise to evidence the Adequate Protection Liens; provided, however that no such filing or recordation shall be necessary or required in order to create, evidence or perfect the Adequate Protection Liens. The Debtors would be authorized and directed to execute and deliver promptly upon demand all such Perfection Documents as the First Priority Collateral Trustee or the Second Priority Collateral Trustee shall reasonably request;

(f)    Superpriority Claims. (i) The First Priority Indenture Trustee shall be granted an allowed superpriority administrative claim as provided for in Section 507(b) of the Bankruptcy Code, with priority over all other administrative claims in the Chapter 11 Cases, including without limitation, claims specified or ordered under Sections 105, 326, 328, 330, 331, 503, 507(a), 552(b), 726, 1113 and 1114 of the Bankruptcy Code, which, subject to the Carve-Out, shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in the cases or any subsequent proceedings under the Bankruptcy Code (the "**First Superpriority Claims**"); and (ii) the Second Priority Indenture Trustee shall be granted an allowed superpriority administrative claim as provided for in Section 507(b) of the Bankruptcy Code, with priority over all other administrative claims in the Chapter 11 Cases, including without limitation, claims specified or ordered under Sections 105, 326, 328, 330, 331, 503, 507(a), 552(b), 726, 1113 and 1114 of the Bankruptcy Code, which, subject to the Carve-Out, shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in the cases or any subsequent proceedings under the Bankruptcy Code (the "**Second Superpriority Claims**" and, together with the First Superpriority Claims, the "**Superpriority Claims**"); provided, however, that the Second Superpriority Claims shall be junior and subordinate to the First Superpriority Claims;

(g)    Carve-Out. The Prepetition Collateral, the Collateral and the Superpriority Claims shall be subject to a carve-out (the "**Carve-Out**") for: (a) all allowed fees and expenses of attorneys, financial advisors, noticing and claims agent, and investment bankers (collectively, the "**Estate Professionals**") employed by the Debtors and, if applicable, any committee appointed in these cases pursuant to Section 1102 of the Bankruptcy Code (a "**Committee**"), if any, pursuant to Sections 327, 328, 1102 and 1103 of the Bankruptcy Code and any disbursements of any member of the Committee which are incurred or accrued prior to the Termination (as defined below) of the Debtors' use of Cash Collateral, (b) following the Termination of the Debtors' use of

Cash Collateral, the payment of allowed fees and disbursements of Estate Professionals (i) incurred or accrued prior to such Termination whether or not then allowed and (ii) incurred or accrued after such Termination by the Estate Professionals and any disbursements of any member of the Committee in an aggregate amount not to exceed $100,000 (in addition to fees and expenses previously incurred or accrued prior to Termination of the Debtors' use of Cash Collateral but which are subsequently allowed), and (c) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court; provided, however, no portion of the Carve-Out or any Cash Collateral shall be used for professional fees and disbursements incurred in connection with the commencement and prosecution of any adversary proceeding or contested matter in which any person or entity asserts any claims or causes of action against any or all of the Prepetition Secured Parties and/or challenges or raises any defense to any of the Existing Liens of the Prepetition Secured Parties. No payment of any Carve-Out amount shall reduce any of the Prepetition Secured Obligations; and

(h)     Nothing in the Interim Order shall be deemed or construed to obligate any Prepetition Secured Party (i) to pay compensation to or reimburse expenses of any Estate Professional or to guarantee that the Debtors will have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve-Out; or (iii) to consent or withhold any objection to the allowance of the fees and expenses of any Estate Professionals.

(vi)     Modification of the Automatic Stay; Stay Relief Upon Event of Default: Paragraph 5 of the Interim Order provides that the automatic stay imposed under Bankruptcy Code Section 362(a) shall be modified as necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to: (a) permit the Debtors to grant the Adequate Protection Liens and Superpriority Claims; (b) permit the Prepetition Secured Parties and the Debtors to perform such acts as the Prepetition Secured Parties may determine in their reasonable discretion to assure the perfection and priority of the Adequate Protection Liens granted therein; (c) permit the Debtors to incur all liabilities and obligations to the Prepetition Secured Parties under the Interim Order; and (d) authorize the Debtors to pay, and the Prepetition Secured Parties to retain and apply, payments made in accordance with the terms of the Interim Order; provided, however that any relief from stay with respect to the exercise of remedies upon any Event of Default (as defined below) shall be in accordance with Paragraph 11 of the proposed Interim Order or as otherwise ordered by this Court.

Paragraph 11 of the Interim Order provides that to the extent that an Event of Default (as defined below) occurs as a result of Debtors' failure to comply with the then applicable Budget, and such Event of Default is not timely cured, the automatic stay imposed pursuant to Section 362 of the Bankruptcy Code, as it applies to the Prepetition Secured Parties, shall be lifted within five (5) business days of the corresponding Termination (as defined below); provided, that with respect to any other Event of Default, the Prepetition Secured Parties (or any of them individually) shall have the right to file a motion with the Court to lift the automatic stay on three business days' notice to the Debtors, the Office of the U.S. Trustee and, if applicable, to any Committee. Notwithstanding the occurrence of an Event of Default or whether a Default Notice (as defined below) is provided or not, each of the Prepetition Secured Parties shall retain all rights, interests, liens, privileges, claims and protections pursuant to the Interim Order and the Note Documents, and the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in the Interim Order. If the Debtors fail to cure the default within the Cure Period (as defined below), the Debtors shall be permitted, on 24 hours notice to the Prepetition Secured Parties and their counsel, to request expedited relief from the Court to seek to use Cash Collateral on a non-consensual basis, and except as provided herein, all of the parties' respective rights and defenses thereto shall be preserved.

(vii)    <u>Reporting Requirements</u>:  Paragraph 7 of the Interim Order provides that the Debtors shall deliver to counsel for the First Priority Indenture Trustee, counsel to the First Priority Collateral Trustee, counsel to the Second Priority Indenture Trustee, counsel to the Second Priority Collateral Trustee, Counsel for the Ad Hoc Committee of First Priority Noteholders and counsel to the Supporting Second Priority Noteholders (collectively, the "**Receiving Parties**") on or before the close of business on Thursday of every other week (beginning on April 14, 2011) a report (or reports) setting forth:

(a)    (i) The amount of the Debtors' aggregate unrestricted cash balances as of the last business day of the immediately preceding calendar week (a "**Reporting Date**") and (ii) the aggregate amount of cumulative disbursements made by the Debtors from the Petition Date through the Reporting Date;

(b)    A Budget reconciliation setting forth for each line item in the Budget through the Reporting Date, the budgeted amounts, actual receipts and disbursements for each week through the Reporting Date, and variances, in each case and on a weekly basis and a cumulative basis from the Petition Date through the Reporting Date; and

(c)     Any supporting information for the foregoing reports requested by the Receiving Parties.

(viii)   Section 506(c) and 552(b) Waivers; No Marshaling:  Paragraph 9 of the Interim Order provides that, subject to and only upon entry of the Final Order, the Debtors, on their own behalf and on behalf of their bankruptcy estates, irrevocably waive and shall not assert any surcharge claim, under Section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Prepetition Secured Parties upon, the Prepetition Collateral.  None of the Prepetition Secured Parties shall be subject to the equitable doctrine of marshaling or any similar doctrine with respect to the Prepetition Collateral.  The Prepetition Secured Parties shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception in Section 552(b) of the Bankruptcy Code shall not apply to any Prepetition Secured Party with respect to proceeds, products, offspring or profits of any of the Prepetition Collateral.

(ix)    Events of Default:  Paragraph 10 of the Interim Order provides that the occurrence of any of the following events (each an "**Event of Default**"), unless waived in writing by the Supporting First Priority Noteholders, in consultation with the Supporting Second Priority Noteholders, shall constitute an event of default under the Interim Order:

(a)     the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(b)     the appointment of a trustee or examiner with expanded powers in any of the Chapter 11 Cases;

(c)     the failure to obtain a Final Order within 30 days after the Petition Date;

(d)     the Debtors' breach or failure to comply with any material term, covenant, representation, warranty or requirement of the Interim Order, including, without limitation, the use of any Prepetition Collateral or Cash Collateral in a manner inconsistent with the then applicable Budget (subject to Permitted Deviations (as defined below) and Permitted Non-Conforming Uses (as defined below));

(e)     except as set forth in the  Budget, the sale of any portion of any Debtors' assets outside the ordinary course of business without the prior consent of the Supporting First Priority Noteholders, in consultation with the Supporting Second Priority Noteholders;

(f) the failure by the Debtors to maintain the Collateral or to insure the Collateral as required by the Note Documents;

(g) the filing of a motion by the Debtors seeking to (x) incur additional indebtedness or liabilities with a priority senior to or *pari passu* with the Prepetition Secured Obligations or the Superpriority Claims, or (y) grant or permit to exist liens with a priority senior to or *pari passu* with the Existing Liens or the Adequate Protection Liens;

(h) the granting or approval in favor of any other party other than the Prepetition Secured Parties of a security interest in or lien upon any property of the Debtors' estates;

(i) the entry of an order by the Court, other than the Interim Order, granting relief from or modifying the automatic stay with respect to the enforcement of any existing lien, or the granting of an additional lien, on the Collateral;

(j) any stay, reversal, vacation or rescission of the terms of the Interim Order, or any modification of any terms of the Interim Order that is not acceptable to the Supporting First Priority Noteholders, in consultation with the Supporting Second Priority Noteholders; or

(k) the termination of the FPN Restructuring Support Agreement upon an Automatic Termination Event or a Termination Event (both as defined in the FPN Restructuring Support Agreement), other than a Unilateral Termination Event (as defined in the FPN Restructuring Support Agreement) for which a Supporting First Priority Noteholder acting individually gives notice of termination.

(x) Termination: Paragraph 10 of the Interim Order provides that the Debtors' authorization to use Cash Collateral shall terminate (any of the following occurrences being referred to herein as a "**Termination**"): (A) immediately, without the need for any action by any Prepetition Secured Party upon the occurrence of an Event of Default under Sections 31(C)(ix)(a), 31(C)(ix)(b) or 31(C)(ix)(k) above; and (B) with respect to all other Events of Default in Section 31(C)(ix) above, after the delivery by the Supporting First Priority Noteholders of written notice of an Event of Default (a "**Default Notice**"), the Debtors shall have failed to cure such default by the close of business on the date that is one business day after delivery of the Default Notice (the "**Cure Period**"). For the avoidance of doubt, if the Debtors timely cure the Event of Default (other than an Event of Default caused by failure to comply with the Budget) prior to the end of the Cure Period, no Termination shall occur, and the Debtors shall be permitted to continue to use Cash Collateral thereafter, subject to the terms and conditions set forth in the Interim Order, in accordance with the

Budget (subject to Permitted Deviations and Permitted Non-Conforming Uses).

## Relief Requested

32.     To address their operational needs, fund the costs and expenses of administering the cases and fund the Plan processes, the Debtors require the use of the Cash Collateral of the Prepetition Secured Parties.  The use of Cash Collateral will provide the Debtors with the necessary capital with which to operate and maintain their businesses, pay their expenses, and confirm the Plan, which will de-leverage the company and maximize the value of the Prepetition Collateral.

33.     The Debtors seek authority to use the Cash Collateral during the Interim Period, and, subject to the entry of the Final Order, during the remainder of the cases, subject in all respects to the termination of the Debtors' use of Cash Collateral as set forth in the Orders.  The Debtors also seek the authority to grant adequate protection to the Prepetition Secured Parties for their respective interests in the Cash Collateral, on account of the Debtors' use of the Cash Collateral.

34.     Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an interim hearing to consider entry of the Interim Order, and schedule the Final Hearing to consider entry of the Final Order.  The Debtors also request that the Court establish notice procedures for objections to the entry of a Final Order at the Final Hearing.

## Basis For Relief

### A.     Basis for Immediate Relief

35.     The reasons underlying the Debtors' need to use Cash Collateral during the limited course of the cases are compelling.  The Debtors believe that the Prepetition Secured Parties have prepetition liens on all of the Debtors' assets.  Accordingly, the Debtors have no

unencumbered cash. Therefore, the use of Cash Collateral is required to fund day-to-day operating expenses and the administration of the cases. Unless the Court authorizes the use of the Cash Collateral upon the terms and conditions of the Orders, the Debtors will be unable to pay for services and expenses necessary to continue their business operations and to consummate the financial restructuring embodied in the Plan. Therefore, granting the Debtors authority to use the Cash Collateral during the Interim Period is necessary to avoid immediate and irreparable harm to the Debtors' estates and is in the best interests of the Debtors' estates and their creditors.

36. The Debtors have prepared the Budget, a copy of which is attached to this Motion as **Exhibit B.** The Budget reflects on a line-item basis the Debtors' anticipated aggregate cash receipts and aggregate necessary and required expenses for each week covered by the Budget. The Debtors are requesting that they be authorized to use Cash Collateral solely to pay the expense items set forth in the Budget or as otherwise provided in the Interim Order; provided, however, that: (a) no amounts may be expended for prepetition debt except to the extent provided in the Interim Order, the Plan or any other orders of this Court; (b) any amendments to the Budget shall be subject to the prior approval of the Supporting First Priority Noteholders and in consultation with the Supporting Second Priority Noteholders; and (c) if the parties cannot resolve a discrepancy related to the Budget, the matter shall promptly be addressed to the Court.

37. During the Interim Period (and for any period following entry of the Final Order) the aggregate actual cumulative disbursements by the Debtors, excluding any fees or expenses paid to the professionals of the First Priority Noteholders or Second Priority Noteholders, must be no greater than 110% of the aggregate amount of cumulative projected disbursements for such period as set forth in the then applicable Budget (the **"Permitted Deviations"**). The Supporting First Priority Noteholders may, in consultation with the Supporting Second Priority Noteholders,

agree with the Debtors to the use of Cash Collateral (i) in a manner or amount which does not conform to the then applicable Budget (other than Permitted Deviations) (each such use of Cash Collateral, a "**Permitted Non-Conforming Use**") or (ii) for any period following the period for the Budget (each such period, a "**Subsequent Budget Period**") pursuant to one or more budgets (each such budget, a "**Subsequent Budget**"). If such consent is given, the Debtors shall be authorized pursuant to the Orders to expend Cash Collateral for any such Permitted Non-Conforming Use or any such Subsequent Budget Period in accordance with a Subsequent Budget without further Court approval, and the Prepetition Secured Parties shall be entitled to all of the protections specified in the Orders for any such use of Cash Collateral. No such consent shall be effective unless the Indenture Trustees, HSBC as First Priority Collateral Trustee, and the Second Priority Collateral Trustee have been notified.

38.      Pursuant to the Budget, the Debtors intend to use the Cash Collateral to, among other things, (a) continue operating while in Chapter 11, including paying utilities, payroll, vendors, capital expenditures related to Satmex 8, and other overhead in the ordinary course of business, (b) pay the costs and expenses of administering the cases including, without limitation funding the professional and other fees associated with the cases, and (c) otherwise effectuate the Plan. Without the use of the Cash Collateral, the Debtors would be unable to confirm the Plan and bring about a successful conclusion to the cases.

**B.      Applicable Authority**

39.      Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use, sell or lease cash collateral, as defined under Section 363(a) of the Bankruptcy Code, unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

40.     Further, Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used   or  proposed  to  be  used  . . .  by  [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Section 361 of the Bankruptcy Code details three ways in which adequate protection may be provided:

> (1)  requiring the [debtor-in-possession] to make a cash payment or periodic cash payments to such entity, to the extent that the . . . use, sale or lease under Section 363 of this title . . . results in a decrease of the value of such entity's interest in such property;
>
> (2)  providing to such entity an additional or replacement lien to the extent such . . . use, sale [or] lease . . . results in a decrease in the value of such entity's interest in such property; or
>
> (3)  grant such other relief, other than entitling such entity to compensation allowable under Section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

41.     According to the legislative history, a finding of adequate protection is "left to case-by-case interpretation and development.  It is expected that the courts will apply the concept in light of facts of each case and general equitable principals." H.R. Rep. No. 595, 95th Cong., 2nd Sess. 339 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6295; *see also In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Nashua Trust Co.*, 73 B.R. 423, 430-31 (Bankr. D. NJ. 1987). The purpose of granting adequate protection is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996); *In re Planned Sys., Inc.*, 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987).

42.     Here, the Indenture Trustees and holders of more than 66-2/3% of both the First

Priority Notes and Second Priority Notes, through the Amendment and the Restructuring Support

Agreements, specifically contemplated a bankruptcy filing and agreed with the Debtors as to

what would constitute adequate protection in the event of such a filing, subject to Court

approval. Thereafter, the holders of more than 66-2/3% of the First Priority Notes and more than

66-2/3% of the Second Priority Notes entered into Restructuring Support Agreements with the

Debtors whereby the Debtors agreed to seek entry of an order authorizing the use of cash

collateral that included specified adequate protection for such use of cash collateral in the event

of a bankruptcy filing, which negotiated adequate protection has been provided in the proposed

Orders. The Debtors believe that both the First Priority Noteholders and the Second Priority

Noteholders have or will consent to the use of Cash Collateral.

43.     Moreover, regardless of the consent provided by the Amendment and/or the

Restructuring Support Agreements, the Court should also authorize the use of Cash Collateral of

the Prepetition Secured Parties because the Prepetition Secured Parties' interests in the

Prepetition Collateral are adequately protected by the provisions set forth herein. The Debtors

recognize that the Prepetition Secured Parties are entitled, under Sections 361 and 363 of the

Bankruptcy Code, to adequate protection of their interests in the Cash Collateral to the extent

there is a diminution in the value of the Prepetition Collateral from and after the Petition Date.

The Debtors believe that the proposed adequate protection detailed above and in the Interim

Order, which was negotiated in both the Amendment and the Restructuring Support Agreements,

is sufficient to account for any diminution in the value of the Prepetition Secured Parties'

Prepetition Collateral and is fair and reasonable and thus, satisfies the standards in Sections

363(c)(2)(B) and 363(e) of the Bankruptcy Code. The suggested adequate protection provides

periodic cash payments of interest to the First Priority Noteholders, and the following for both tranches of Prepetition Noteholders: payment of fees and expenses, replacement liens, superpriority claims and other relief to provide adequate protection, all in compliance with Section 361 of the Bankruptcy Code.

44. Additionally, the terms and conditions under which the Debtors may use Cash Collateral have been carefully designed to meet the dual goals of Sections 361 and 363 of the Bankruptcy Code and to avoid immediate and irreparable harm to the Debtors' estates. The Debtors' use of Cash Collateral will be limited by the Budget, in both the Interim Period and, subject to entry of the Final Order, throughout the length of the term of the Budget. Given the pre-packaged nature of these cases, the Debtors only intend to remain in bankruptcy for a short period of time, thus limiting the time period in which the use of Cash Collateral will be necessary. The creditors entitled to vote on the Plan have overwhelmingly voted in support thereof and the Debtors expect to achieve confirmation of the Plan in approximately sixty (60) days. In light of the expedited nature of these cases, the consent that has been provided to the Debtors' use of the Cash Collateral and the grant of adequate protection to the Prepetition Secured Parties proposed herein, the Debtors respectfully submit that the Court should grant the relief requested in the Motion.

## C. Establishing Notice Procedures and Request for Final Hearing

45. The Debtors further respectfully request that, pursuant to Bankruptcy Rule 4001(b)(2), the Court set a date and time for the Final Hearing at least fourteen (14) days after the date on which the Motion was filed to consider the entry of the Final Order approving the relief sought in this Motion on a final basis.

46. The Debtors shall, on or before two (2) business days following entry of the Interim Order, mail copies of a notice of the entry of the Interim Order, together with a copy of

the Interim Order, to the parties who were sent notice of the Preliminary Hearing, to any party which has filed prior to such date a request for notice with this Court and to counsel for the Committee, if any is appointed.

47. Any party in interest objecting to the relief sought herein shall serve and file written objections with the United States Bankruptcy Court Clerk for the District of Delaware no later than seven (7) calendar days before the Final Hearing, which shall be served so that the same are received on or before such date by: (i) Satélites Mexicanos, S.A. de C.V., Avenida Paseo de la Reforma, Num. 222, Floors 20 and 21, Col. Juarez, Mexico, D.F. 06600, Attn: Pablo Manzur y Bernabeu; (ii) Greenberg Traurig LLP, 200 Park Avenue, New York, New York 10166, Attn: Nancy Mitchell *with a copy to* Greenberg Traurig, LLP, 1007 N. Orange Street, Suite 1200, Wilmington, Delaware 19801, Attn: Victoria Watson Counihan and Greenberg Traurig, P.A., 333 Avenue of the Americas, Miami, FL 33131, Attn: Paul J. Keenan, Jr., Esq. (proposed counsel to Debtors and Debtors in Possession); (iii) U.S. Bank National Association, 633 West Fifth Street, 24th Floor, Los Angeles, CA 90071, Attn: Stephen Rivero (First Priority Indenture Trustee); (iv) Maslon Edelman Borman & Brand, LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402, Attn: Clark T. Whitmore (counsel to First Priority Indenture Trustee); (v) HSBC Bank USA, National Association, 10 E. 40th Street, 14th Floor, Corporate Trust and Loan Agency, New York, NY 10016, Attn: Sandra E. Horwitz (First Priority Collateral Trustee); (vi) SNR Denton, Two World Financial Center, New York, New York 10281, Attn: Stephen T. Whelan (Counsel to First Priority Collateral Trustee); (vii) Wells Fargo Bank, National Association, 45 Broadway, 14th Floor, New York, NY 10006, Attn: Martin G. Reed (Second Priority Trustee); (viii) Seward & Kissel LLP, One Battery Park Plaza, New York, NY 10004, Attn: Laurie Binder (counsel to Second Priority Trustee); (ix) Ropes &

Gray LLP, 1211 Avenue of the Americas, New York, NY 10036, Attn: Mark I. Bane *with a copy*

*to* Ropes & Gray LLP, Prudential Tower, 800 Boylston Street, Boston, MA 02199-3600, Attn:

Stephen Moeller-Sally (counsel to the Supporting Second Priority Holders); (x) Dechert LLP,

1095 Avenue of the Americas, New York, NY 10036-6797, Attn: Michael J. Sage and Brian E.

Greer (Counsel to the Ad Hoc Committee of First Priority Noteholders); (xi) Office of the United

States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE 19801;

and (xi) counsel for any Committee (if such a committee has been formed and such counsel has

been retained).

### Bankruptcy Rule 6003 Satisfied and Request for Waiver of Stay

48.     The Debtors further submit that because the relief requested in this Motion is

necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein

and in the Northland Declaration, Bankruptcy Rule 6003 has been satisfied and the relief

requested herein should be granted.

49.     Specifically, Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and
> irreparable harm, the court shall not, within 20 days after the filing
> of the petition, grant relief regarding the following: . . . (b) a
> motion to use, sell, lease, or otherwise incur an obligation
> regarding property of the estate, including a motion to pay all or
> part of a claim that arose before the filing of the petition, but not a
> motion under Rule 4001.

50.     No court within the Third Circuit has interpreted the "immediate and irreparable

harm" language in the context of Bankruptcy Rule 6003 in any reported decision. However, the

Third Circuit Court of Appeals has interpreted the same language in the context of preliminary

injunctions. In that context, irreparable harm has been interpreted as a continuing harm that

cannot be adequately redressed by final relief on the merits and for which money damages

cannot provide adequate compensation. *See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235

Fed. Appx. 907, 910 (3d Cir. 2007) (*citing Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)).

Further, the harm must be shown to be actual and imminent, not speculative or unsubstantiated.

*See, e.g., Acierno v. New Castle County*, 40 F.2d 645, 653-55 (3d Cir. 1994).

51.    The Debtors further seek a waiver of any stay of the effectiveness of the order

approving this Motion. Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[an] order

authorizing the use, sale, or lease of property other than cash collateral is stayed until the

expiration of ten (10) days after entry of the order, unless the court orders otherwise." As set

forth above in detail, the relief requested herein is essential to prevent irreparable damage to the

Debtors' operations, going-concern value, and their efforts to pursue their financial restructuring

through the Plan.

52.    Accordingly, the relief requested herein is appropriate under the circumstances

and under Bankruptcy Rule 6003 and 6004(h).

### Notice

53.    The Debtors have provided notice of this Motion to: (i) the Office of the United

States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured

creditors; (iii) Counsel to the Ad Hoc Committee of First Priority Noteholders; (iv) counsel to

the *ad hoc* committee of Second Priority Noteholders; (v) counsel to Jefferies Finance LLC; (vi)

counsel for the First Priority Collateral Trustee; (vii) counsel for the First Priority Indenture

Trustee; (viii) counsel for the Second Priority Collateral Trustee and Second Priority Indenture

Trustee; (ix) counsel for the directors of Satmex appointed by the holders of Satmex's Class I

Series B shares; (x) counsel to the Secretariat of Communications and Transport for the

Government of Mexico; (xi) those parties requesting notice pursuant to Rule 2002; (xii) the

Office of the United States Attorney General for the District of Delaware; (xiii) the Internal

Revenue Service; (xiv) the Securities and Exchange Commission; and (xiv) known holders of liens on any of the Debtors' assets. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion in accordance with the Local Rules. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

54. No prior motion for the relief requested in this Motion has been made to this or any other court.

**WHEREFORE,** the Debtors request that the Court (i) immediately enter the Interim Order, (ii) schedule the Final Hearing and at the Final Hearing, enter the Final Order, and (iii) grant the Debtors such other and further relief as it deems may be just and proper under the circumstances.

[SIGNATURE PAGE FOLLOWS]

Dated: April 6, 2011

GREENBERG TRAURIG, LLP

*Victoria W. Counihan*

Victoria W. Counihan (No. 3488)
Matthew L. Hinker (No. 5348)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: counihanv@gtlaw.com

- and -

Nancy A. Mitchell
Alexandra Aquino-Fike
Aviram Fox
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: mitchelln@gtlaw.com

- and -

Paul J. Keenan Jr.
333 Avenue of the Americas
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
Email: keenanp@gtlaw.com

Proposed Counsel for the Debtors

## Index of Exhibits

Exhibit A - Proposed Form of Interim Order

Exhibit B - Budget

Exhibit C - Intercreditor Agreement

Exhibit D - Amendment and Limited Waiver Agreement

Exhibit E - SPN Restructuring Support Agreement

Exhibit F - FPN Restructuring Support Agreement