# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SATÉLITES MEXICANOS, S.A. DE C.V. *et al.*,[1] | Case Nos. 11-[_____] (___) |
| Debtors. | (Joint Administration Requested) |

**MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 363(b), 365(a), 503(b)(1) AND 507(a)(2) AND BANKRUPTCY RULES 2002, 6003, 6004(h) AND 6006 FOR AN ORDER: (I) AUTHORIZING THE DEBTORS TO (A) ASSUME THE BACKSTOP COMMITMENT AGREEMENT AND ENTER INTO THE RIGHTS OFFERING ESCROW AGREEMENT IN CONNECTION WITH RIGHTS OFFERING AND (B) INCUR AND PAY RELATED FEES, EXPENSES AND INDEMNIFICATION OBLIGATIONS; (II) FINDING THAT ANY PROCEEDS AND OTHER ASSETS HELD IN THE RIGHTS OFFERING ESCROW ACCOUNTS ARE NOT PROPERTY OF THE ESTATE AND SHOULD NOT BE CONSOLIDATED WITH THE DEBTORS' ASSETS OR ESTATES PRIOR TO THE EFFECTIVE DATE; (III) APPROVING THE RIGHTS OFFERING PROCEDURES AND FORMS; AND (IV) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (each, a "**Debtor**" and, collectively, the "**Debtors**") hereby move the Court (the "**Motion**")[2] for entry of an order pursuant to Sections 105(a), 363(b), 365(a), 503(b)(1) and 507(a)(2) of Title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6003, 6004(h) and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"): (I) authorizing the Debtors to (A) assume the Backstop Commitment Agreement (as defined below) and enter into the Rights Offering Escrow Agreement (as defined below) in connection with the Rights Offering (as defined below) and (B) incur and pay related fees, expenses and indemnification obligations, (II)

---

[1] The Debtors in these Chapter 11 Cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Satélites Mexicanos, S.A. de C.V. (0653); Alterna'TV Corporation (2940); and Alterna'TV International Corporation (4784).

[2] Unless otherwise specified, all capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in the Plan.

finding that any proceeds and other assets held in the Rights Offering Escrow Accounts (as defined below) are not property of the estate and should not be consolidated with the Debtors' assets or estates prior to the effective date (the "**Effective Date**") of the *Joint Prepackaged Plan of Reorganization of Satélites Mexicanos, S.A. De C.V., et al. Under Chapter 11 of the Bankruptcy Code* (the "**Plan**"), (III) approving the Rights Offering Procedures and Forms (as defined below), and (IV) granting related relief. In support of the Motion, the Debtors rely on the *Declaration of Patricio E. Northland in Support of Debtors' Chapter 11 Petitions and Request for First Day Relief* (the "**Northland Declaration**") and respectfully state as follows:

### Preliminary Statement

1. The Plan, filed contemporaneously with these Chapter 11 Cases, is the culmination of over one year of good faith negotiations among the Debtors and their major constituencies. Under the Plan, the holders of the Debtors' First Priority Notes (as defined below) and general unsecured creditors will be paid in full and the Debtors will emerge from Chapter 11 in approximately forty-five days fully-recapitalized. Through a prepetition solicitation, the Debtors have received overwhelming support for the Plan from holders of the First Priority Notes, as well as from holders of the Second Priority Notes (as defined below) - the only impaired class of creditors under the Plan. Of those holders of the Second Priority Notes that timely submitted ballots, 100% in number and 100% in amount voted to accept the Plan.

2. The restructuring contemplated by the Plan is intended to address, among other things, three fundamental challenges facing the Debtors: (i) the obligation to repay the First Priority Senior Secured Notes due 2011 (the "**First Priority Notes**"), issued and outstanding in an aggregate principal amount of approximately $238.2 million and scheduled to mature in November, 2011, (ii) the need to de-lever their balance sheets, and (iii) the need to construct new

satellites to replace those of the Debtors' current satellites that have a limited remaining operational life.

3.      In order to fund distributions under the Plan and to meet necessary future capital expenditures, the Debtors have arranged to procure $325 million in debt financing (the "**Debt Financing**") and an equity financing of up to $96.25 million, in each case to be funded on the Effective Date. The equity financing will be accomplished through the Rights Offering (defined below), which has been fully backstopped by certain holders of Satmex's 10 1/8% Second Priority Senior Secured Notes (the "**Second Priority Notes**").[3] Without both of these forms of financing, the Debtors' restructuring is simply not feasible.

4.      Moreover, the Debtors have determined that, together with the Debt Financing, the Rights Offering will provide the best opportunity to consummate the Plan, obtain additional liquidity and successfully emerge from these Chapter 11 Cases in a way that maximizes value for the Debtors' estates and their creditors. Therefore, by this Motion, the Debtors seek relief which will enable them to consummate the Rights Offering.[4]

5.      Specifically, in connection with the Rights Offering, the Debtors are now seeking authority to assume or enter into, as applicable, and to perform their obligations under the Backstop Commitment Agreement and the Rights Offering Escrow Agreement (collectively, the "**Rights Offering Agreements**"), the terms of which have been extensively negotiated at arm's-

---

[3] Contemporaneously herewith, the Debtors have also filed the *Motion Pursuant to Bankruptcy Code Sections 105(a), 363(b), 365, 503(b)(1), 507(a)(2), 541 and 542 and Bankruptcy Rules 2002, 6003, 6004(h) and 6006 for an Order (I) Providing That Special Purpose Entity Is Not a Debtor and Any Proceeds or Assets Held By Such Entity or in the New Satmex Escrow Account Are Not Property of the Debtors' Estates and Shall Not Be Consolidated with the Debtors' Assets or Turned Over to the Debtors' Estates Prior to the Effective Date; (II) Authorizing the Debtors to (A) Assume and/or Enter into Agreements in Connection with the Debt Financing and (B) Incur and Pay Related Fees, Expenses and Indemnification Obligations; and (III) Granting Related Relief* (the "**Debt Financing Motion**") to enable them to take necessary steps to consummate the Debt Financing pursuant to the terms of the Plan.

[4] The Debtors, however, are not seeking authority in this Motion to consummate the Rights Offering, such authority is sought in the Plan itself.

length by the Debtors and the various counterparties to the Rights Offering Agreements. Moreover, the Rights Offering Agreements contain the mechanics necessary to implement the Rights Offering, which is a critical component of the Plan and will help ensure the Debtors' expeditious emergence from Chapter 11. Consequently, the Debtors' decision to assume the Backstop Commitment Agreement, enter into the Rights Offering Escrow Agreement and incur and pay the related fees, expenses and indemnification obligations represents a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates and the various parties in interest.

6.     As described more fully herein and subject to the order approving this Motion becoming final and non-appealable, the Debtors propose to close the Rights Offering and the amount required to fund the Liquidity Distribution Option into two distinct escrow accounts (collectively, the **"Rights Offering Escrow Accounts"**), pursuant to the Backstop Commitment Agreement and that certain escrow agreement (the **"Rights Offering Escrow Agreement"**), prior to the hearing to consider confirmation of the Plan. Because the Rights Offering Escrow Agreement creates a "true escrow" under New York law and only non-debtors will possess the proceeds of the Rights Offering and/or other assets in the Rights Offering Escrow Accounts until the Effective Date, such proceeds and/or assets should neither be deemed "property of the estate" nor consolidated with the Debtors' assets or estates prior to the Effective Date.

7.     Pursuant to this Motion, the Debtors also request entry of an order approving the procedures related to the Rights Offering (the **"Rights Offering Procedures"**), substantially in the form of **Exhibit A**, along with the proposed subscription forms (the **"Subscription Forms,"** and together with the Rights Offering Procedures, the **"Rights Offering Procedures and Forms"**), substantially in the form of **Exhibit B**. The Debtors have worked closely with the

Supporting Second Priority Noteholders to construct the Rights Offering Procedures and Forms. The Rights Offering Procedures and Forms are designed to enable the Debtors to transmit efficiently the materials relevant to the Rights Offering and provide Eligible Rights Holders a fair opportunity to exercise any Rights in connection therewith.

8.      Although the Debtors will not have access to the proceeds of the Rights Offering until the Effective Date, which the Debtors expect will occur on or before May 26, 2011, approval of the Motion on an expedited basis is essential to ensure the Debtors of the availability of committed financing.  The agreements and transactions discussed herein are crucial to the implementation of the Plan, are supported by all of the Debtors' major constituencies, are necessary to ensure the Debtors' expeditious emergence from Chapter 11 and should be approved by the Court.

### Status of the Case and Jurisdiction

9.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of these Chapter 11 Cases, is set forth in detail in the Northland Declaration.

10.     The Debtors are operating their businesses and managing their property as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and no statutory committees have been appointed or designated.

11.     On the Petition Date, the Debtors filed with the Court, among other things, (i) the Plan, (ii) the *Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization of Satélites Mexicanos, S.A. De C.V., Alterna'TV Corporation, and Alterna'TV International*

*Corporation Under Chapter 11 of the Bankruptcy Code* (the "**Disclosure Statement**"), and (iii) a motion seeking an order, *inter alia*, scheduling a hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan for a date that is as soon as practicable but within approximately 35 days of the Petition Date.

12.     The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are Sections 105(a), 363(b), 365, 503(b)(l) and 507(a)(2) of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2) and (c), 6003, 6004(h), and 6006.

**Background**

**I.      The Debtors' Plan of Reorganization**

13.     On March 8, 2011, the Debtors commenced the solicitation of votes on the Plan in accordance with Sections 1125(g) and 1126(b) of the Bankruptcy Code. As of April 4, 2011 (the "**Solicitation Deadline**"), the Debtors had received votes from First Priority Noteholders and holders of the Second Priority Notes (the "**Second Priority Noteholders**") sufficient to overwhelmingly accept the Plan.

14.     By separate motion filed on the date hereof, the Debtors have requested authority to pay all prepetition general unsecured claims in the ordinary course of business during the pendency of these Cases. Pursuant to the terms of the Plan, the holders of Satmex General Unsecured Claims, Alterna'TV General Unsecured Claims and Alterna'TV International General Unsecured Claims not paid in the ordinary course of business will have their legal, equitable and contractual rights unaltered by the Plan and will have their Allowed Claims paid in full in cash on the Effective Date or as soon thereafter as is reasonably practicable.

15.     The Plan similarly provides that the class of holders of the First Priority Notes (the "**First Priority Noteholders**") is unimpaired and such holders will receive payment in full, in cash of the total outstanding principal and accrued but unpaid interest at the applicable non-default rate of 12% per annum under the First Priority Notes as of the Effective Date without any premium or penalty. Out of an abundance of caution, against the possibility that any First Priority Noteholder believed it was impaired by the proposed treatment under the Plan, the Debtors solicited votes on the Plan from the First Priority Noteholders and, as of the Solicitation Deadline, the class of First Priority Noteholders voted overwhelmingly to approve the Plan.

16.     As contemplated by the Plan, the funding for the restructuring will come from (i) the issuance of First Lien Senior Secured Notes in an aggregate principal amount of at least $325 million (the "**New Satmex Notes**," and such offering, the "**New Satmex Notes Offering**"),[5] (ii) the Rights Offering in an aggregate amount of up to $96.25 million, and (iii) the Debtors' cash. This funding will allow the Debtors to retire the First Priority Notes, make other payments under the Plan, fund the completion of a replacement satellite, and position the Debtors to pursue other future growth opportunities.

A.      **The Rights Offering**

17.     The class of Second Priority Noteholders has also voted overwhelmingly to approve the Plan. The Plan provides that holders of the Second Priority Notes (the "**Second Priority Noteholders**") are entitled to receive their pro rata share of direct or indirect equity interests representing 7.146% of the economic interests in Reorganized Satmex (the "**Conversion Interests**"), <u>plus</u> an opportunity to participate in a rights offering, whereby an

---

[5] As further described in the Debt Financing Motion, filed contemporaneously herewith, if the New Satmex Notes Offering does not yield gross proceeds of at least $325 million prior to, or concurrently with, the proposed transactions under the Plan, Jeffries Finance LLC has committed to provide senior secured increasing rate loans under a senior bridge loan facility (the "**Bridge Loan Facility**") in an aggregate principal amount of $325 million, which may ultimately be converted into term loans.

eligible Second Priority Noteholder may exercise the following rights (collectively, the "**Rights**"):

    a.    Rights to subscribe for their pro rata share of direct or indirect equity interests representing 85.753% of the economic interests in Reorganized Satmex (the "**Primary Rights**," and such offering the "**Primary Rights Offering**"); and

    b.    Provided that the holder properly and fully exercises its Primary Rights, rights to subscribe for its pro rata share of direct or indirect equity interests issued in respect of a follow-on equity offering, which may be funded, subject to the satisfaction of certain conditions, within 18 months after the Effective Date (the "**Follow-On Rights**," and such offering, the "**Follow-On Rights Offering**," and together with the Primary Rights Offering, the "**Rights Offering**").

18.    The maximum subscription amount for the Primary Rights Offering will be $96.25 million (less amounts invested by the Mexican Partners in Holdsat México, S.A.P.I. De C.V. ("**Mexico Holdings**") upon the closing of the Primary Rights Offering), and the maximum subscription amount for the Follow-On Rights Offering will be $40 million (less amounts invested by the Mexican Partners in Mexico Holdings upon the closing of the Follow-On Rights Offering). Certain Second Priority Noteholders (the "**Backstop Parties**") have agreed to backstop the Rights Offering pursuant to the terms of a Commitment Agreement entered into on January 13, 2011 and to which Satmex became a party on January 22, 2011 (the "**Backstop Commitment Agreement**").

19.    It is contemplated that, prior to the Effective Date, the Second Priority Noteholders that elect to participate in the Rights Offering will fund their portion of the Primary Rights Offering exercise price (the "**Primary Rights Offering Exercise Price**") into the Rights Offering Escrow Account. Also prior to the Effective Date, the Backstop Parties will fund the balance of the Primary Rights Offering Exercise Price into the Rights Offering Escrow Account. On the same day, the Second Priority Noteholders' portion of the purchase price of that certain

Share Purchase Agreement, entered into on December 22, 2010 (the "**Share Purchase Agreement**")[6] will be transferred from the Rights Offering Escrow Accounts to a separate account where the funds for the purchase of Satmex's equity under the Share Purchase Agreement will be escrowed until the Effective Date.

20.     The proceeds from the Rights Offering and the Debt Financing, as well as available cash, will allow the Debtors to retire the First Priority Notes, de-lever their balance sheet, and construct new satellites to replace those of the Debtors' current satellites that have a limited remaining operational life.[7]

21.     As an alternative to electing to receive Conversion Interests and participate in the Rights Offering, each Second Priority Noteholder, other than the Backstop Parties, may elect to receive, in *lieu* of its pro rata share of the Conversion Interests and Rights (including both Primary Rights and Follow-On Rights) a cash payment of 38 cents for each dollar in principal amount of such Second Priority Note Claims (the "**Liquidity Distribution Option**"), which shall be funded on the Effective Date by certain of the Backstop Parties (the "**Liquidity Option Backstop Parties**").  Any Second Priority Noteholder that elects the Liquidity Distribution Option must relinquish its pro rata share of Conversion Interests and Rights (including both Primary Rights and Follow-On Rights) to the Liquidity Option Backstop Parties, which shall be

---

[6] Satmex's shareholders – Deutsche Bank México, S.A., Institución de Banca Múltiple, División Fiduciaria, solely and exclusively as trustee in the Irrevocable Administration Trust Agreement No. F/589, and Nacional Financiera, S.N.C., Institución de Banca de Desarollo, Dirección Fiduciaria, solely and exclusively as trustee in the Irrevocable Administration Trust Agreement No. 80501– entered into the Share Purchase Agreement with Mexico Holdings, as buyer, for the acquisition of all of the Series A, Series B, and Series N Stock currently outstanding, representing 100% of Satmex's equity securities.  Mexico Holdings has assigned or may assign a portion of its rights and obligations under the Share Purchase Agreement relating to its equity interests to be owned by Satmex International BV, which will be indirectly controlled by the former Second Priority Noteholders through Satmex International Coöperative U.A., Satmex Investment Holdings L.P. and Satmex Investment Holdings GP, Ltd.  The Debtors, however, are not a party to the Share Purchase Agreement.

[7] In the event that the New Satmex Notes Offering is not successful, the proceeds of the Rights Offering and the cash available on the Effective Date will be used in accordance with the terms of the Bridge Loan Facility.

entitled to acquire such Conversion Interests and exercise such Rights in exchange for cash payment of 38 cents for each dollar in principal amount of such electing Second Priority Noteholder's Second Priority Note Claim.

**B.    The Agreements to be Assumed or Entered into By the Debtors in Connection with the Rights Offering, and the Related Fees, Expenses and Indemnification Obligations.**

22.    As further described below, in order to facilitate the prefunding of the Rights Offering and consummate the various transactions contemplated by the Plan, the Debtors seek authorization to assume the Backstop Commitment Agreement and enter into the Rights Offering Escrow Agreement.  As is reasonable and customary for transactions in the nature of the Rights Offering, the Debtors also will be required to incur obligations to pay certain fees, expenses and indemnification obligations (collectively, the "**Rights Offering Obligations**") prior to confirmation as are set forth in the Rights Offering Agreements.

### 1.    The Backstop Commitment Agreement

23.    Mexico Holdings and the Backstop Parties entered into the Backstop Commitment Agreement on January 13, 2011.  Subsequently, Satmex became a signatory to the Backstop Commitment Agreement on January 22, 2011, and Satmex Investment Holdings GP Ltd. ("**Investment Holdings GP**") joined as a party on March 31, 2011.  A copy of the Backstop Commitment Agreement is attached hereto as **Exhibit C**.  As described above, in connection with the Plan, the Debtors have commenced a solicitation for elections with respect to (a) the Primary Rights Offering and (b) the Follow-On Rights Offering.  The Backstop Parties have agreed to exercise all of the Rights granted to them as holders of Second Priority Note Claims and to purchase, on a *pro rata* basis, any interests under the Primary Rights Offering that are not subscribed by the other holders of Second Priority Note Claims.  In addition, the Liquidity Option Backstop Parties have committed to provide funding for payments to holders of Second

Priority Note Claims that elect the Liquidity Distribution Option under the Plan. In consideration for their various commitments, the Backstop Parties are entitled under the Plan to receive a put premium of additional Investment Holdings Interests representing 4.5% of the economic interests in Reorganized Satmex. The commitment of the Backstop Parties with respect to the Rights Offering and the Liquidity Distribution Option funding is subject to various conditions.

24.     Pursuant to the terms of the Backstop Commitment Agreement, the Debtors have agreed to take certain actions including, but not limited to: (i) filing a motion and supporting papers seeking entry of an order approving the Backstop Commitment Agreement; (ii) filing the Plan and Disclosure Statement within one (1) business day of the Petition Date; (iii) using their reasonable best efforts to seek confirmation of the Plan within 60 days of the Petition Date; (iv) obtaining any consents required to consummate the transaction; and (v) seeking entry of an order approving the Rights Offering.

25.     The Debtors have also agreed to reimburse the fees and expenses of the advisors to the Backstop Parties in connection with the transactions (collectively, the "**Transactions**") contemplated by the Backstop Commitment, the Plan, and the Restructuring Documents (as defined in the Backstop Commitment Agreement), whether or not such Transactions are consummated. Moreover, the Debtors are required to pay these fees and expenses within ten days of presentation of an invoice approved by the Backstop Parties, without the Court's review or further order of the Court. The provision of payment of these fees and expenses is an integral part of the Transactions, without which the Backstop Parties would not have entered into the Backstop Commitment Agreement.

26.     Subject to particular conditions further described in the Backstop Commitment Agreement, Satmex and certain of its subsidiaries also agree to indemnify and hold harmless each Backstop Party, the shareholders of Mexico Holdings, the Intermediate Holding Company (as defined in the Backstop Commitment Agreement) and their respective officers, directors, employees, agents, advisors, counsel, representatives, controlling Persons (as defined in the Backstop Commitment Agreement) and Affiliates (as defined in the Backstop Commitment Agreement). These obligations are being incurred irrespective of whether the Rights Offering is consummated or the Backstop Commitment Agreement or obligation of any Backstop Party is terminated. However, the foregoing indemnity will not apply to losses to the extent they are determined by a final order of a court of competent jurisdiction to have resulted from the bad faith or willful misconduct of such Backstop Party.

## 2.     *Rights Offering Escrow Agreement*

27.     The Rights Offering Escrow Agreement, which is governed by the laws of the State of New York, will be entered into with Wilmington Trust FSB (the "**Escrow Agent**") and Investment Holdings GP. The Rights Offering Escrow Agreement creates the Rights Offering Escrow Accounts, which include following: (i) an account to hold the proceeds of the Rights Offering and the contribution of the Mexican Investment Partners and (ii) an account to hold the Liquidity Option Funding Amount. The proceeds in each account will be released on the Effective Date.

28.     To the extent not otherwise paid pursuant to the New Satmex Notes Escrow Agreement (as defined in the Debt Financing Motion) for the New Satmex Notes Offering, Satmex is also required to transfer funds the into Rights Offering Escrow Account to cover the Escrow Agent's fees and reasonable out of pocket expenses. A copy of the Rights Offering

Escrow Agreement will be substantially in the form of the agreement attached hereto as **Exhibit D**.

29.     Pursuant to the Rights Offering Escrow Agreement, the Escrow Agent is entitled to payment from the Debtors for customary fees and expenses for all services rendered by the Escrow Agent.  In addition, the Escrow Agent will not be liable for failing to perform any act or fulfilling any duty, obligation or responsibility under the Escrow Agreement by reason of any occurrence beyond the control of the Escrow Agent.  The Escrow Agent may also consult with legal counsel of its own choosing, at the expense of Satmex as to any matter relating to the Escrow Agreement.

30.     Satmex will also reimburse and indemnify the Escrow Agent and hold the Escrow Agent harmless from and against any and all claims, losses, liabilities, costs, damages or expenses arising from or in connection with or related to the Escrow Agreement or being Escrow Agent.  The foregoing indemnity, however, will not apply to Losses (as defined in the Escrow Agreement) caused by the Escrow Agent's gross negligence, willful misconduct or bad faith.

C.     **The Rights Offering Procedures and Forms to be Approved.**[8]

31.     The Debtors and the Supporting Second Priority Noteholders have developed procedures designed to ensure that the Rights Offering is consummated in an orderly and timely fashion, as follows:

*1.     Submission of Election Forms*

32.     In connection with the solicitation of votes to accept or reject the Plan, the Debtors distributed to holders of Second Priority Note Claims, as of the Voting Record Date, an Election Form, which provided such holders the option to elect either (a) to accept their

---

[8] Any capitalized terms used in this Section, but otherwise undefined, shall have the meanings ascribed to them in the Rights Offering Procedures and Forms.

Conversion Interests and Rights or (b) to participate in the Liquidity Distribution Option. In accordance with the Rights Offering Procedures, the Debtors propose that, in order to participate in the Rights Offering, holders of Second Priority Note Claims or any Permitted Assignees of such holders submit a validly completed Election Form electing Option 1 no later than 5:00 p.m. (prevailing Eastern time) on April 18, 2011 (the **"Election Expiration Time"**).

33. If a holder of a Second Priority Note Claim fails to return an Election Form by the Election Expiration Time or timely returns an Election Form but fails to make an election, such holder will be deemed to have elected to receive its pro rata share of Conversion Interests only. Such holder will not be eligible to participate in the Rights Offering and such holder's Rights shall be terminated and cancelled in full without compensation at the Election Expiration Time. Such holder will receive its Conversion Interests in the form of Reorganized Satmex Common Stock (Series B) and Reorganized Satmex Common Stock (Series N).

34. If a holder of Second Priority Note Claims timely returns an Election Form having elected both Option 1 and Option 2, such holder will be deemed (i) to have elected to participate in the Liquidity Distribution Option and (ii) to have relinquished its pro rata share of Conversion Interests and Rights to the Liquidity Option Backstop Parties. Such holder will not be eligible to participate in the Rights Offering.

### 2. *Rights Exercise*

35. As soon as practicable after the Election Expiration Time, Epiq Bankruptcy Solutions, LLC ("**Epiq**"), as the Debtors' subscription agent,[9] will deliver subscription materials, including a Subscription Form (collectively, the "**Subscription Packages**"), in the form attached

---

[9] The Debtors sought authorization to retain and employ Epiq as the subscription agent in the *Application of the Debtors for Order Pursuant to 28 U.S.C. § 156(c), Section 105(a) of the Bankruptcy Code and Local Rule 2002-1(f) Authorizing the Retention and Employment of Epiq Bankruptcy Solutions, LLC As Balloting, Noticing, Claims and Subscription Agent*, filed concurrently herewith.

to the Rights Offering Procedures as **Exhibit B** to each holder of a Second Priority Note Claim on the Voting Record Date that has timely submitted a validly completed Election Form electing Option 1 and whose bank or broker has tendered such holder's Second Priority Notes (a "**Voting Record Date Rights Holder**") or such holder's Permitted Assignee (each such Voting Record Date Rights Holder or its Permitted Assignee, an "**Eligible Rights Holder**"). Included in the Subscription Packages will be copies of the Master Investor Rights Agreement and the partnership agreement of Satmex Investment Holdings L.P. (collectively, the "**Equityholder Agreements**"). The Debtors will file copies of the Equityholders Agreements with the Court substantially contemporaneously with the initiation of the subscription process.

36. Eligible Rights Holders must then submit all required Rights Offering Deliveries (as defined in the Subscription Forms) to Epiq and pay the applicable Primary Rights Offering Subscription Price to the Rights Offering Escrow Agent no later than 5:00 p.m. (prevailing Eastern time) on the date set forth in the Rights Offering Procedures (the "**Subscription Expiration Time**"), provided, however, that each Backstop Party will pay its Primary Rights Offering Subscription Price prior to the Effective Date together with other amounts required to satisfy its commitments under the Backstop Commitment Agreement. Any election made through timely submitted and validly completed Rights Offering Deliveries, accompanied by the payment of the Primary Rights Offering Subscription Price, that has not been validly revoked by the Subscription Expiration Time shall be irrevocable.

37. An Eligible Rights Holder will be deemed to have elected not to participate in the Rights Offering if such holder: (i) fails to timely submit all required Rights Offering Deliveries and pay its Primary Rights Offering Subscription Price by the Subscription Expiration Time, or (ii) timely returns all required Rights Offering Deliveries but fails to make an election or fails to

pay its Primary Rights Offering Subscription Price. Such Eligible Rights Holder's Rights will terminate and be cancelled in full without compensation at the Subscription Expiration Time, and such holder will receive its Conversion Interests in the form of Reorganized Satmex Common Stock (Series B) and Reorganized Satmex Common Stock (Series N).

### 4. *Liquidity Option*

38.     Within ten (10) business days after the Election Expiration Time, Epiq will provide each Liquidity Option Backstop Party a notice setting forth certain procedures relating to the exercise of the Liquidity Distribution Option. Each Liquidity Option Backstop Party will then be required to transfer its share of the Liquidity Amount into the Liquidity Option Escrow Account no later than one business day prior to the Effective Date, which amount shall be held in escrow by the Rights Offering Escrow Agent until the Effective Date.

### 5. *Backstop*

39.     No later than May 6, 2011, Epiq will provide each Backstop Party a notice setting forth, in each case after giving effect to the exercise of the Liquidity Distribution Option, either (i) the Primary Pro Rata Allocable Share available to be purchased by such Backstop Party (including, in the case of a Liquidity Option Backstop Party, any Primary Pro Rata Allocable Share of Liquidity Option Holders that have, by virtue of the exercise of the Liquidity Distribution Option, been relinquished to such Liquidity Option Backstop Party) and the Primary Rights Subscription Exercise Price therefor and wire instructions for the Rights Offering Escrow Accounts or (ii) in the event that the Primary Rights are fully subscribed by Eligible Rights Holders in accordance with the Rights Offering Procedures, the fact that there are no such Primary Rights available for purchase under the Backstop Commitment, and that the Backstop Commitment is terminated.

**Relief Requested**

40.     As part of their exit from Chapter 11, the Debtors seek through this Motion entry

of an order, pursuant to Sections 105(a), 363(b), 365, 503(b)(1) and 507(a)(2) of the Bankruptcy

Code and Bankruptcy Rules 2002, 6003, 6004(h) and 6006: (I) authorizing the Debtors to (A)

assume the Backstop Commitment Agreement and enter into the Rights Offering Escrow

Agreement in connection with the Rights Offering and (B) incur and pay related fees, expenses

and indemnification obligations, (II) finding that any proceeds and other assets held in the Rights

Offering Escrow Accounts are not property of the estate and should not be consolidated with the

Debtors' assets or estates prior to the Effective Date, (III) approving the Rights Offering

Procedures and Forms, and (IV) granting related relief.

**Basis for Relief Requested**

I.      **The Debtors Should Be Authorized to (A) Assume the Backstop Commitment Agreement and Enter into the Rights Offering Escrow Agreement in Connection with the Rights Offering and (B) Incur and Pay Related Fees, Expenses and Indemnification Obligations.**

   A.      **Assumption of the Backstop Commitment Agreement is a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates.**

41.     The Debtors' assumption of the Backstop Commitment Agreement is an exercise

of sound business judgment and should therefore be authorized.    Section 365(a) of the

Bankruptcy Code permits the trustee to assume or reject any executory contract of the debtor.  11

U.S.C. § 365(a); *see also In re Fleming Cos., Inc.*, 499 F.3d 300, 304 (3d Cir. 2007); *Cinicola v.

Scharffenberger,* 248 F.3d 110 119 (3d Cir. 2001) (noting that the debtor may maximize the

value of  its estate by "assuming executory contracts . . . that benefit the estate and rejecting

those that do not").  A contract is executory under Section 365 "if each party has an unperformed

obligation at the time of the bankruptcy filing that would constitute a material breach if not

performed." *In re S.A. Holding Co., LLC*, 357 B.R. 51, 57 (Bankr. D.N.J. 2006) (citing *In re Columbia Gas Sys., Inc.*, 50 F.3d 233, 238 (3d Cir. 1995)).

42.     The Third Circuit has adopted the business judgment standard in determining whether a debtor is justified in assuming or rejecting an executory contract. *See Nickels Midway Pier, LLC v. Wild Waves, LLC*, 341 B.R. 486, 493 (D.N.J. 2006) (citing *Sharon Steel v. Nat'l Fuel Gas Distrib. Corp. (In re Sharon Steel Corp.)*, 872 F.2d 46, 40 (3d Cir. 1989)); *see also In re Distrib. Energy Sys. Corp.*, Case No. 08-11101 (KG), 2008 WL 4641350, at *2 (Bankr. D. Del. Oct. 17, 2008) (citing *Sharon Steel*, 872 F.2d at 40).   The analysis considers whether a reasonable business person would make a similar decision under similar circumstances and whether assuming the contract is in the best interests of the bankruptcy estate.   *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (applying business judgment rule to rejection of executory contract); *In re Mottola*, Case No. 97-19361 (DWS), 1997 WL 860674, at *2 (Bankr. E.D. Pa. Dec. 3, 1997); *see also In re Bellis*, Case No. 05-41366 (DHS), 2006 WL 2380997, at *8 (Bankr. D.N.J. Aug. 16, 2006).

43.     The business judgment rule presumes that directors act in good faith and take actions that they honestly believe is in the best interests of the company and shields a debtor's management from liability and judicial second-guessing. *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005) (applying Delaware law); *see also Official Comm. of Unsecured Creditors v. Baldwin*, Case No. 10cv800 (AJS), 2010 WL 4275252, at *7 (Bankr. W.D. Pa. Oct. 25, 2010); *Buckley v. O'Handlon*, Case No. 04-955 (GMS), 2007 WL 956947, at *5 (D. Del. Mar. 28, 2007) ("The business judgment rule is a presumption that a board's actions are entitled to deference, because it would be overly harsh to condemn such a decision that only in hindsight was poorly conceived."). Accordingly, debtors are given significant discretion when

requesting to assume or reject an executory contract. *See Tower Air*, 416 F.3d at 238

("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean

task. Delaware courts have said that it may be accomplished by showing either irrationality or

inattention"); *In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y. 1997) ("[A] court will

ordinarily defer to the business judgment of the debtor's management . . . .").

44.     The Debtors' decision to assume the Backstop Commitment Agreement satisfies

the business judgment test and ensures timely exit from the reorganization process. Indeed, the

Backstop Commitment Agreement facilitates the Debtors' emergence from Chapter 11 by

providing one of the two critical sources of liquidity to fund the Plan and continue their business

operations after emergence. Moreover, the terms of the Backstop Commitment Agreement are

the result of extensive, arm's-length negotiations between the Debtors and the Backstop Parties,

and are reasonable given the nature and size of the transactions contemplated by such

agreements. Thus, the Debtors' decision to assume the Backstop Commitment Agreement

represents a sound exercise of the Debtors' business judgment and, consequently, the Debtors

should be authorized to assume the Backstop Commitment Agreement.

**B.      A valid business justification exists for entry into the Rights Offering Escrow Agreement, as well as the payment and incurrence of related fees, expenses and indemnification obligations contemplated by the Rights Offering Agreements.**

45.     The Debtors should also be authorized to enter into the Rights Offering Escrow

Agreement to consummate the transactions contemplated therein and to pay and incur the fees,

expenses and indemnification obligations associated with the Rights Offering Agreements,

pursuant to Bankruptcy Code Section 363. Section 363(b)(1) of the Bankruptcy Code provides,

in relevant part, that a debtor, "after notice and a hearing may use, sell or lease, other than in the

ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts generally

authorize transactions outside the ordinary course of business if (i) the debtor has an articulated sound business justification, (ii) the debtor provides adequate notice to all creditors and (iii) a hearing is held. *See, e.g., In re Martin*, 91 F.3d 389, 295 (3d Cir. 199) (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (explaining that the Third Circuit has adopted the "sound business purpose" test to evaluate motions brought pursuant to Section 363(b) of the Bankruptcy Code); *In re Dornier Aviation (N. Am.)*, Case Nos. 02–82003–SSM, 02–82004–SSM, 2002 WL 31999222, at *7 (Bankr. E.D. Va. 2002) (finding that Section 363(b)(1) of the Bankruptcy Code requires "notice and a hearing . . . before a trustee or debtor in possession may enter into contracts that are not in the ordinary course of business") (citing *In re Roth Am.*, Inc., 975 F.2d 949, 952 (3rd Cir. 1992).

46.     As in the case of assuming executory contracts pursuant to Section 365 of the Bankruptcy Code, courts have authorized debtors to enter into rights offering agreements and incur fees and expenses related thereto so long as the debtor's conduct is consistent with its exercise of "business judgment." *See, e.g., In re Aleris Int'l, Inc.*, Case No. 09-10478 (BLS) (Bankr. D. Del. Mar. 15, 2010) (Docket No. 1662) (authorizing debtors to enter into equity commitment agreement in connection with rights offering under plan of reorganization and to pay related fees and expenses); *In re Accuride Corp.*, Case No. 09-13449 (BLS) (Bankr. D. Del. Dec. 19, 2009) (Docket No. 442) (authorizing debtors to conduct rights offering and approving related agreements).

47.     Similarly, this and other Bankruptcy Courts have approved debtors' requests to enter into escrow agreements on the basis of the debtor's reasonable business judgment. *See,*

*e.g.*, *In re Cooper-Standard Holdings Inc.*, Case No. 09-12743 (PJW) (Bankr. D. Del. April 19,

2010) (Docket No. 1243) (authorizing debtors to pre-fund into escrow $450 million of proceeds

from note issuance relating to exit financing); *In re AbitibiBowater, Inc.*, Case No. 09-11296

(KJC) (Bankr. D. Del. Aug. 24, 2010) (Docket No. 3015) (authorizing debtors to pre-fund into

escrow $750 million of proceeds from note issuance relating to exit financing); *In re Am. Media

Inc.*, Case No. 10-16140 (MG) (Bankr. S.D.N.Y. Nov. 29, 2010) (Docket No. 72) (authorizing

debtors to pre-fund into escrow $525 million of proceeds from note issuance relating to exit

financing); *In re Chemtura Corp.*, Case No. 09-11233 (REG) (Bankr. S.D.N.Y. Aug. 9, 2010)

(Docket No. 3536) (authorizing debtors to pre-fund into escrow $750 million of proceeds of exit

financing notes offering or term loan); *In re Lyondell Chem. Co.*, Case No. 09-10023 (REG)

(Bankr. S.D.N.Y. Mar. 24, 2010 (Docket No. 4051) (authorizing debtors to pre-fund into escrow

$2.25 billion of proceeds from exit financing note offering, authorizing escrow agent to execute

agreements and grant liens in connection therewith and authorizing the debtor to form a non-

debtor entity to receive proceeds of the notes offering); *In re The Reader's Digest Assoc., Inc.*,

Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Feb. 1, 2010) (Docket No. 617) (authorizing

debtors to execute, deliver and perform under and implement escrow and security agreement).

48.     The Rights Offering Escrow Agreement facilitates the necessary transactions

underlying the Rights Offering. Indeed, the protections provided by the Escrow Agreement are

necessary to incentivize the Second Priority Noteholders to participate in the Rights Offering and

thereby pre-fund a portion of the Debtors' exit financing. As described herein, these proceeds

are essential because they will fund disbursements, distributions and other amounts payable

under the Plan and provide for the Debtors' future ordinary course working capital needs.

Accordingly, given the importance of the Rights Offering proceeds to the Debtors' restructuring,

it is imperative that the Debtors know in advance of the confirmation hearing that they have sufficient funding. Moreover, the terms of the Rights Offering Escrow Agreement are the result of extensive, arm's-length negotiations between the Debtors and the counterparties to the Rights Offering Escrow Agreement. Therefore, in the exercise of the Debtors' business judgment, and after consultation with their financial and legal advisors, the Debtors believe that entry into the Rights Offering Escrow Agreement will benefit the Debtors, their estates, and all parties in interest.

49. Furthermore, the payment of fees and expenses and the provision of indemnification have been approved as a sound exercise of business judgment when the transactions enable a debtor to secure financing at a price the debtor believes is fair. *See In re Integrated Health Servs., Inc.*, Case No. 00-00389 (MFW) (Bankr D. Del., Feb. 14, 2002) (Docket No. 6662).

50. For the foregoing reasons, the Debtors' decision to assume the Backstop Commitment Agreement and enter into the Rights Offering Escrow Agreement satisfies the business judgment test because, among other things, the Rights Offering provides the Debtors with the best opportunity to consummate the Plan, obtain additional liquidity and successfully emerge from these Chapter 11 Cases in a way that maximizes value of the Debtors' estates. Accordingly, the Rights Offering is in the best interests of the Debtors, their estates and creditors. Moreover, the payment of certain fees and expenses in accordance with the Rights Offering Agreements, and the agreement to provide releases and/or indemnities are integral terms of the proposed Rights Offering and are necessary for the Debtors and their counterparties to consummate the transactions related thereto. Such terms are also the product of extensive arm's length negotiations, customary in connection with obtaining exit financing, and are

appropriate in light of the value to be received by the Debtors in obtaining the Rights Offering contemplated by the Motion, and should be approved.

**C.** **The fees and expenses related to the Rights Offering should be awarded administrative expense status under Section 507(a)(2) of the Bankruptcy Code payable immediately and when due during these Cases.**

51.     The fees and expenses of the advisors to the Backstop Parties in connection with the Transactions contemplated by the Backstop Commitment and the Escrow Agent's customary fees and expenses for all services rendered by the Escrow Agent should also be awarded administrative expense status under Section 507(a)(2) of the Bankruptcy Code. These fees and expenses clearly constitute "necessary costs and expense of preserving the estate." 11 U.S.C. § 503(b)(1)(A). Such fees and expenses are deemed administrative expenses entitled to first priority under Section 507 of the Bankruptcy. 11 U.S.C. § 507(a)(2). Moreover, obtaining administrative expense status with respect to the fees and expenses arising under the Backstop Commitment Agreement is an express condition of the Backstop Commitment Agreement and an integral part of the Transactions contemplated therein, without which the Backstop Parties would not have entered into the Backstop Commitment Agreement. Accordingly, without the payment of these fees and expenses, the Debtors will be unable to consummate the Rights Offering, which will thereby jeopardize the Debtors' ability to confirm the Plan and to preserve the value of their businesses for the benefit of all parties in interest.

**IV.**  **The Proceeds of the Rights Offering or Other Assets Held in the Rights Offering Escrow Accounts Should Not Be Deemed Property of the Debtors' Estates and Should Not Be Consolidated with the Debtors' Assets or Estates Prior to the Effective Date.**

52.     Under the facts presented and controlling law, the proceeds of the Rights Offering or other assets that will be held in the Rights Offering Escrow Accounts are not "property of the estate" and should not be consolidated with the Debtors' assets or estates prior to the Effective

Date. Section 541 of the Bankruptcy Code "creates the bankruptcy estate, which consists of all of the property that will be subject to the jurisdiction of the bankruptcy court." 5 *Collier on Bankruptcy* ¶ 541.01 (15th ed. 2010). It limits the estate to property held by the debtor at time the bankruptcy petition is filed. *In re Allegheny Health, Educ. & Research Found.*, 252 B.R. 309, 322 (W.D. Pa. 1999) (citing 11 U.S.C. § 541). Moreover, "[t]he Bankruptcy Code does not operate to include property in the estate unless the debtor has a legal or equitable interest in the property." *TTS, Inc. v. Citibank, N.A. (In re TTS, Inc.)*, 125 B.R. 411, 413 (Bankr. D. Del. 1991) (finding that Chapter 11 debtor had only legal title to escrow fund created for retirement benefits of debtor's former executive, and thus, such fund was not property of estate). In addition, "[t]he determination of each party's interest in the property is made by reference to the applicable state's law." *Pension Benefit Guar. Corp. v. Cont'l Airlines, Inc. (In re Cont'l Airlines)*, 138 B.R. 422, 445 (D. Del. 1992) (citing *Butner v. United States*, 440 U.S. 48, 54-56 (1979)); *TTS, Inc.*, 125 B.R. at 413-14 ("The Code itself does not determine the existence of a legal or equitable interest in property- reference to state law is required.") (citing *Butner*, 440 U.S. at 55).

53.     Generally, "an escrow into which a debtor puts its property (or from which the debtor is entitle to payments after satisfying a condition) is not property of the estate." *In re Atl. Gulf Cmtys. Corp.*, 369 B.R. 156, 164 (Bankr. D. Del. 2007) (holding that funds deposited by debtor into escrow account are not "property of the estate," whereas contingent right to recover funds upon satisfying escrow conditions is "property of the estate"); *Davis v. Cox*, 356 F.3d 76, 93-94 (1st Cir. 2004); *In re Rosenhein*, 136 B.R. 368, 372 (Bankr. S.D.N.Y. 1992) ("According to New York law, a debtor who deposits funds in escrow retains a right to the funds and the incidents of ownership until the escrow conditions are satisfied."); *Hasset v. Blue Cross and Blue Shield of Greater N.Y. (Matter of O.P.M. Leasing Servs., Inc.)*, 46 B.R. 661, 667-68 (Bankr.

S.D.N.Y. 1985) (concluding that property held in escrow is not property of the estate because, for escrow to be valid, the property must be irrevocably placed outside the grantor's control); *but see After Six, Inc. v. Corestates Bank, N.A.*, Bankr. No. 93-11150S, Adv. No. 93-0238S, 1993 WL 224737, at *4 (Bankr. E.D. Pa. 1993) (noting that the Bankruptcy Court for the Eastern District of Pennsylvania has uniformly concluded that funds deposited into escrow by a debtor are property of the debtor's estate) (citing cases); *see also Official Comm. of Unsecured Creditors v. Cushman and Wakefield of Pa., Inc. (In re Shapiro)*, 124 B.R. 974, 982 (Bankr. E.D. Pa. 1991) (noting that significant factor in determining whether escrowed funds are "property of the estate" is whether debtor was depositor of funds and finding that escrowed funds were property of the estate, but the property interest seized by secured creditor prepetition was limited to a technical legal title, which was insufficient for such funds to be turned over to debtor's estate).

54.     An escrow is properly formed under New York law if "(1) property is delivered to a third party by the grantor; (2) the third party holds the property until certain conditions are satisfied; and (3) the third party delivers the property to the grantee." *Sicari, Inc. v. M & G Promo Serv., Ltd.*, 144 B.R. 656, 660 (S.D.N.Y. 1992); *see also 5 Collier on Bankruptcy* ¶ 541.09 (15th ed. 2010) (noting that under New York law, three requirements must be fulfilled to justify a finding that a true escrow exists: (i) an agreement on the terms governing the escrowed assets; (ii) delivery of the funds to a third party with transfer to the grantee conditioned upon the performance of some act or occurrence of some event; and (iii) stipulated conditions must be met before funds can be released) (citing cases).

55.     Also, pursuant to New York law, ""legal title to property placed in escrow remains with the grantor  until the occurrence of the condition specified in the escrow

agreement.'" *Atl. Gulf*, 369 B.R. at 162 (quoting *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687, 710 (Bankr. S.D.N.Y. 1992) (quoting *Hassett v. Blue Cross and Blue Shield of Greater N.Y. (In re O.P.M. Leasing Servs., Inc.)*, 46 B.R. 661, 667 (Bankr. S.D.N.Y. 1985))); *see also TTS, Inc.*, 125 B.R. at 414 (noting that "[l]egal title to property the grantor places in a valid escrow remains with the grantor until the occurrence of the conditions the escrow agreement specifies") (citing *O.P.M. Leasing*, 46 B.R. at 667). Moreover, courts should "examine the Rights Offering Escrow Agreement to determine exactly what rights the Debtor has to those funds." *See Alt. Gulf*, 369 B.R. at 164.

56. The Rights Offering Escrow Agreement, which is governed by New York law, creates a "true escrow." Indeed, pursuant to the terms of the Rights Offering Escrow Agreement and except with respect to Satmex's obligations to fund the Escrow Agent's fees and expenses, the Rights Offering Proceeds and the Liquidity Option Deposit will be transferred from third-party non-Debtors (i.e., the Second Priority Noteholders) to a third-party (i.e., the Escrow Agent), which will hold the funds until certain conditions specified in the Agreement are satisfied. Therefore, the Rights Offering Escrow Agreement creates a "true escrow" under New York law and, as such, the proceeds of the Rights Offering or other assets held in the Rights Offering Escrow Accounts are not "property of the estate" and should not be consolidated with the Debtors' assets or estates prior to the Effective Date.

## IV. The Rights Offering Procedures and Forms Should be Approved Because They Are Fair, Reasonable and Designed to Enable an Eligible Rights Holder to Adequately Determine Whether to Exercise Its Rights.

57. Pursuant to Section 105(a) of the Bankruptcy Code, the Court should also approve the Rights Offering Procedures and Forms because they are fair, reasonable and designed to enable an Eligible Rights Holder to determine whether to exercise its Rights. As discussed above, the Debtors, with the assistance of their legal and financial advisors, have exercised their

sound business judgment in determining to assume the Backstop Commitment Agreement. The Rights Offering, which is an essential component of the Plan, largely hinges on the Debtors ability to assume Backstop Commitment Agreement.

58.     In that regard, the Rights Offering Procedures, which are consistent with, and in furtherance of, the Backstop Commitment Agreement, enable the Debtors to transmit efficiently the materials relevant to the Rights Offering and provide Eligible Rights Holders a fair opportunity to elect to exercise any Rights in connection therewith. In addition, having Eligible Rights Holders complete the Subscription Form and irrevocably commit to participate in the Rights Offering prior to the hearing before the Court to confirm the Plan (the "**Confirmation Hearing**") enables all parties in interest to know, at the time of the Confirmation Hearing, how many rights will be exercised pursuant to the Rights Offering.

59.     The Debtors also seek authority to make non-substantive modifications to the Rights Offering Procedures described in this Motion, with the consent of the Requisite Backstop Parties as provided in the Backstop Commitment Agreement.

60.     In addition, courts in this district and others have approved similar procedures pursuant to which a debtor is authorized to conduct a rights offering. *See, e.g., In re Cooper-Standard Holdings Inc.*, Case No. 09-12743 (PJW) (Bankr. D. Del. Mar. 26, 2010) (Docket No. 1118) (approving proposed rights offering procedures); *In re Merisant Worldwide, Inc.*, Case No. 09-10059 (PJW) (Bankr. D. Del. Oct. 23, 2009) (Docket No. 642) (same); *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Aug. 20, 2007) (Docket No. 1680) (same); *In re Lyondell Chemical Company*, Case No. 09-10023 (REG) (Bankr. S.D.N.Y. March 11, 2010) (authorizing debtors to enter into and perform under equity commitment agreement); *In re Northwest Airlines Corp.*, Case No. 05-17930 (Bankr. S.D.N.Y. Mar. 30, 2007) (same).

61.     Furthermore, the Debtors submit that the Subscription Forms and the related instructions are fair and reasonable, and adequately designed to enable an Eligible Rights Holder to determine whether or not to exercise its Rights to participate in the Rights Offering. Accordingly, the Debtors submit that the Rights Offering Procedures and Forms should be approved.

* * * * *

62.     For the reasons set forth herein, the Debtors request that the Court enter an order, pursuant to Sections 105(a), 363(b) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6003, 6004(h) and 6006:   (I) authorizing the Debtors to (A) assume the Backstop Commitment Agreement and enter into the Rights Offering Escrow Agreement in connection with the Rights Offering and (B) incur and pay related fees, expenses and indemnification obligations, (II) finding that any proceeds and other assets held in the Rights Offering Escrow Accounts are not property of the estate and should not be consolidated with the Debtors' assets or estates prior to the Effective Date, (III) approving the Rights Offering Procedures and Forms and (IV) granting related relief.

**Bankruptcy Rule 6003 Satisfied and Request for Waiver of Stay**

63.     The Debtors further submit that, because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein and in the Northland Declaration, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.   The Debtors also seek a waiver of any stay of the effectiveness of the order approving this Motion pursuant to Rule 6004 or otherwise.[10]

---

[10] Rule 6004(h) provides that "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise."

64.     Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding the following: . . . (a) an application under Rule 2014; (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001; and (c) a motion to assume or assign an executory contract or unexpired lease in accordance with § 365.

65.     No court within the Third Circuit has interpreted the "immediate and irreparable harm" language in the context of Bankruptcy Rule 6003 in any reported decision. However, the Third Circuit Court of Appeals has interpreted the same language in the context of preliminary injunctions. In that context, irreparable harm has been interpreted as a continuing harm that cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. *See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 Fed. Appx. 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)). Further, the harm must be shown to be actual and imminent, not speculative or unsubstantiated. *See, e.g., Acierno v. New Castle County*, 40 F.2d 645, 653-55 (3d Cir. 1994).

66.     As discussed herein, the Plan contemplates the Debtors emerging from bankruptcy in a very short period of time (i.e., within thirty-five (35) days of the Petition Date). However, the Debtors' restructuring cannot be consummated without the Rights Offering, which can only be funded once the Court enters an order approving this Motion. Moreover, without approved procedures, the Debtors cannot begin the subscription process that will allow holders of Second Priority Note Claims to exercise their Rights.

67.     Moreover, the Backstop Commitment and the support of the Supporting Second Priority Noteholders (as defined below) may terminate if such an order is not entered within fifteen (15) calendar days of the Petition Date. Indeed, Section 8(p) of the Restructuring Support

Agreement (the "**SPN Restructuring Support Agreement**"), dated December 22, 2010, by and between Mexico Holdings and certain Second Priority Noteholders, representing at least 66 2/3% of the aggregate outstanding principal amount of the Second Priority Notes (the "**Supporting Second Priority Noteholders**"),[11] provides that the Required Supporting Second Priority Noteholders may terminate the SPN Restructuring Support Agreement if an order approving the Debt Financing and an order approving the Debtors' assumption of the Backstop Commitment Agreement are not entered within fifteen (15) days after the Petition Date.[12]

68.     In addition, Sections 13.2(a) and (b) of the Backstop Commitment Agreement provide that the Backstop Parties may terminate the Agreement if (among other things) (i) the Debtors fail to file a motion seeking approval of their assumption of the Backstop Commitment Agreement within one (1) business day of the Petition Date, and (ii) an order approving the Debtors' assumption of the Agreement is not entered within fifteen (15) days after the motion to assume the Backstop Commitment Agreement is filed.

69.     Thus, the SPN Restructuring Support Agreement and the Backstop Commitment Agreement, two critical agreements for effectuating the Rights Offering, require that the Debtors seek entry of an order approving their assumption of the Backstop Commitment Agreement within fifteen (15) days of the Petition Date. Any delay in entering such order could lead to the termination of the Backstop Commitment Agreement, which would clearly cause immediate and irreparable damage by jeopardizing the Debtors' ability to raise the funds needed through the Rights Offering and the Debtors' ability to confirm the Plan and to preserve the value of their businesses for the benefit of all parties in interest.

---

[11] The Debtors subsequently joined the SPN Restructuring Support Agreement on January 22, 2011.

[12] A copy of the SPN Restructuring Support Agreement is attached hereto as **Exhibit E**.

70.     Furthermore, the Rights Offering cannot be consummated without (i) the Debtors' ability to enter into the Rights Offering Escrow Agreement, (ii) the Debtors' ability to pay related fees, expenses and indemnification obligations, (iii) approval of the Rights Offering Procedures and Forms, and (iv) a finding that any proceeds and other assets held in the Rights Offering Escrow Accounts are not property of the Debtors' estates. Specifically, if the Debtors are unable to obtain to obtain the aforementioned relief, they will be unable to establish the Rights Offering Escrow Accounts and all holders of Second Priority Notes who elect to participate in the Rights Offering will be restricted from wiring their Primary Rights Offering Subscription Exercise Price to the Rights Offering Escrow Accounts prior confirmation of the Plan and prior to the Effective Date. Without an ability to establish the Rights Offering Escrow Accounts immediately, the Rights Offering will be stalled and will not be consummated before the Effective Date, severely jeopardizing the Debtors' ability to confirm the Plan and will cause the Debtors irreparable harm.

71.     Accordingly, the debtors submit that ample cause exists to enter an order approving the Motion less than twenty-one (21) days after the commencement of these Cases and to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h) or otherwise, to the extent that any such stay would apply to the Motion.

## Notice

72.     Notice of this Motion shall be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors; (iii) counsel to the *ad hoc* committee of First Priority Noteholders; (iv) counsel to the *ad hoc* committee of Second Priority Noteholders; (v) counsel to Jefferies Finance LLC; (vi) counsel for the First Priority Collateral Trustee; (vii) counsel for the First Priority Indenture Trustee; (viii) counsel for the Second Priority Collateral Trustee and Second Priority Indenture Trustee; (ix) counsel for the directors of Satmex appointed by the holders of Satmex's Class I Series B shares; (x) counsel to the Secretariat of Communications and Transport for the Government of Mexico; (xi) those parties requesting notice pursuant to Rule 2002; (xii) the Office of the United States Attorney General for the District of Delaware; (xiii) the Internal Revenue Service; and (xiv) the Securities and Exchange Commission.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

73.     No prior motion for the relief requested herein has been made to this Bankruptcy Court or any other Court.

## Conclusion

WHEREFORE, the Debtors respectfully request that this Court enter an order granting the relief requested herein and that it grant the Debtors such other and further relief as is just and proper.

Dated: April 6, 2011

GREENBERG TRAURIG, LLP

*Victoria W. Counihan*

Victoria W. Counihan (No. 3488)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360
Email: counihanv@gtlaw.com

- and -

Nancy A. Mitchell
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: mitchelln@gtlaw.com

- and -

Paul J. Keenan
333 Avenue of the Americas
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
Email: keenanp@gtlaw.com

Proposed Counsel for the Debtors and Debtors In Possession