IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SATÉLITES MEXICANOS, S.A. DE C.V. et al.,[1] | Case Nos. 11-11035 (CSS) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF J. BLAKE O'DOWD IN SUPPORT OF DEBTORS' DEBT FINANCING MOTION AND RIGHTS OFFERING MOTION

I, J. Blake O'Dowd, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

### Background

1. I am a Managing Director at Lazard Frères & Co. LLC ("**Lazard**"), an investment banking and financial advisory firm that maintains offices at 30 Rockefeller Plaza, New York, New York 10020. Lazard was retained by the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") on June 3, 2010 to provide investment banking and financial advisory services to the Debtors and has assiduously assisted the Debtors in developing, preparing, negotiating, finalizing and implementing the *Joint Prepackaged Plan of Reorganization of Satélites Mexicanos, S.A. de C.V., et al. Under Chapter 11 of the Bankruptcy Code* (the "**Plan**"). Since then, Lazard has become familiar with the Debtors' businesses and capital structure, as well as their financial restructuring initiatives. In addition, Lazard has assisted the Debtors in structuring and securing exit financing.

---

[1] The Debtors in these Chapter 11 cases, along with the last four (4) digits of each Debtor's federal tax identification number, are: Satélites Mexicanos, S.A. de C.V. (0653); Alterna'TV Corporation (2940); and Alterna'TV International Corporation (4784).

2. I initially joined Lazard in 1999. In 2007, I left Lazard to serve as Head of Morgan Stanley's Restructuring Group and rejoined Lazard in April 2009. I graduated *Magna Cum Laude* from Duke University with a degree in economics and also received an MBA from the Leonard Stern School of Business at New York University in 1994.

3. I have extensive experience with both in-court and out-of-court restructurings, as well as experience with public and private debt and equity offerings and mergers and acquisitions. I have advised companies, lenders and creditors' committees in connection with numerous restructurings, including, among others, AbitibiBowater, Fruit of the Loom, Kaiser Aluminum, LNR Property Corp., Metrocall, National Energy Group, US Industries and Wireless One.

4. I submit this declaration (the "**Declaration**") in support of the *Motion Pursuant to Bankruptcy Code Sections 105(a), 363(b), 365, 503(b)(1), 507(a)(2), 541 and 542 and Bankruptcy Rules 2002, 6003, 6004(h) and 6006 for an Order (I) Providing That Special Purpose Entity Is Not a Debtor and Any Proceeds or Assets Held By Such Entity or in the New Satmex Escrow Account Are Not Property of the Debtors' Estates and Shall Not Be Consolidated with the Debtors' Assets or Turned Over to the Debtors' Estates Prior to the Effective Date; (II) Authorizing the Debtors to (A) Assume and/or Enter into Agreements in Connection with the Debt Financing and (B) Incur and Pay Related Fees, Expenses and Indemnification Obligations; and (III) Granting Related Relief* (the "**Debt Financing Motion**") and the *Motion Pursuant to Bankruptcy Code Sections 105(a), 363(b), 365(a), 503(b)(1) and 507(a)(2) and Bankruptcy Rules 2002, 6003, 6004(h) and 6006 for an Order: (I) Authorizing the Debtors to (A) Assume the Backstop Commitment Agreement and Enter Into the Rights Offering Escrow Agreement in Connection with the Rights Offering and (B) Incur and Pay Related Fees, Expenses and*

*Indemnification Obligations; (II) Finding That Any Proceeds and Other Assets Held in the Rights Offering Escrow Accounts Are Not Property of the Estate and Should Not Be Consolidated with the Debtors' Assets or Estates Prior to the Effective Date; (III) Approving the Rights Offering Procedures and Forms; and (IV) Granting Related Relief* (the "**Rights Offering Motion**").[2]

5. The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have received from the Debtors' employees or advisors and/or employees of Lazard working directly with me or under my supervision, direction or control, or from the Debtors' records maintained in the ordinary course of their businesses. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

6. The restructuring contemplated by the Plan is intended to address, among other things, three fundamental challenges facing the Debtors: (i) the obligation to repay the First Priority Senior Secured Notes due 2011 (the "**First Priority Notes**"), issued and outstanding in an aggregate principal amount of approximately $238.2 million and scheduled to mature in November, 2011, (ii) the need to construct new satellites to replace those of the Debtors' current satellites that have a limited remaining operational life, and (iii) the need to de-lever the Debtors' balance sheets.

7. In the months leading up to the Debtors filing for bankruptcy protection under Chapter 11, Lazard assisted the Debtors in analyzing their financing needs and possible alternatives for obtaining such financing. After such analysis, it became clear that (i) due to the existing capital structure and the need to fund committed obligations relating to the

---

[2] Capitalized terms used herein, but otherwise undefined, shall have the meanings ascribed to them in the Debt Financing Motion and the Rights Offering Motion, as applicable.

construction and launch of the Debtors' Satmex 8 replacement satellite, it was not possible to restructure the Debtors without additional financing, (ii) in order to successfully raise new debt financing the Debtors also needed to have equity financing, and (iii) the existing Second Priority Notes would have to be equitized. Moreover, the Federal Government of the United Mexican States and the Series B Unit Holders expressed that they would not support the Debtors' restructuring unless financing was obtained on a fully committed basis. The support of these constituencies was necessary for the Debtors to effectuate a restructuring and successfully exit from bankruptcy.

8. In order to fund distributions under the Plan and to meet necessary future capital expenditures, Lazard assisted the Debtors in procuring $325 million of fully committed debt financing (the "**Debt Financing**") and $96.25 million of fully committed equity financing, in each case to be funded on the Effective Date. The equity financing will be accomplished through the Rights Offering, which has been fully backstopped by certain holders (the "**Backstop Parties**") of Satmex's 10 1/8% Second Priority Senior Secured Notes (the "**Second Priority Notes**"). Without both of these forms of financing, the Debtors' restructuring is simply not feasible.

## The Rights Offering

9. After reviewing other potential sources of equity financing, the Debtors and Lazard determined that the best source of such equity financing would be through negotiations with the existing holders of the Second Priority Notes. Thus, after several months of strenuous arm's-length negotiations, the Debtors and the Backstop Parties reached agreement over the terms of the Rights Offering to be incorporated into the Plan. To ensure that the Rights Offering

raises the required funds, the Debtors have entered into a Commitment Agreement with the Backstop Parties to backstop the Rights Offering (the "**Backstop Commitment**").

10. The Debtors propose to close the Rights Offering and the amount required to fund the Liquidity Distribution Option (as discussed in more detail in the Plan and its accompanying disclosure statement) into two distinct escrow accounts (collectively, the "**Rights Offering Escrow Accounts**"), pursuant to the Backstop Commitment Agreement and that certain escrow agreement (the "**Rights Offering Escrow Agreement**"), prior to the hearing to consider confirmation of the Plan.

11. Because the Backstop Commitment guarantees the success of the Rights Offering and, in turn, the Rights Offering is required to effectuate the Debt Financing, the Backstop Commitment significantly reduces the financing risk associated with consummating the Plan. Additionally, Lazard has benchmarked the fees awarded as consideration for providing the Backstop Commitment and believes they are within the range of what other backstop providers have received in other recent Chapter 11 cases. The terms of the Backstop Commitment and Rights Offering Escrow Agreement and the Debtors' obligations thereunder are therefore reasonable and appropriate under the circumstances and, consequently, assuming and entering into the agreements, as applicable, is in the best interests of the Debtors' estates and all parties in interest.

## The Debt Financing

12. In furtherance of the restructuring contemplated by the Backstop Commitment and the SPN Restructuring Support Agreement, Lazard sought potential underwriters for committed exit financing for the Debtors. Lazard requested financing proposals for exit financing from five leading financial institutions, each of whom had significant capital-

raising expertise in the satellite industry. Of the five, only representatives of Jefferies & Company, Inc. ("**JefCo**") and one other institution expressed confidence in their ability to underwrite fully-committed financing in the amount, form and timing required. Satmex and its advisors proceeded to facilitate the due diligence activities of Jefferies Finance, LLC ("**Jefferies Finance**," and together with JefCo, "**Jefferies**") and the other potential underwriter over the ensuing three months, and also to negotiate the terms of the two alternative proposals in parallel. At the end of this lengthy and competitive process, the terms of the proposal submitted by Jefferies Finance were the more attractive of the two, and hence various agreements regarding the exit financing were executed.

13. As a result of the foregoing negotiations and efforts to obtain financing, the Debtors have entered into arrangements for the issuance of First Lien Senior Secured Notes in an aggregate principal amount of at least $325 million (the "**New Satmex Notes**," and such offering, the "**New Satmex Notes Offering**") or, if the New Satmex Notes Offering is not successful, the senior secured increasing rate loans (the "**Bridge Loans**," and together with the New Satmex Notes Offering, the "**Debt Financing**") under a senior bridge loan facility.

14. In connection with the Debt Financing, the Debtors entered into the following agreements prepetition: (i) engagement letter, dated February 13, 2011, by and between Jefco and Satmex (the "**Jefco Engagement Letter**"), (ii) commitment letter, dated February 13, 2011, by and between Satmex and Jefferies Finance (the "**Jefferies Commitment Letter**") and (iii) fee letter, dated February 13, 2011, by and between Satmex and Jefferies Finance (the "**Jefferies Fee Letter**" and, together with the Jefco Engagement Letter and the Jefferies Commitment Letter, the "**Jefferies Letters**"). Postpetition, it is contemplated that the Debtors will enter into that certain escrow agreement (the "**New Satmex Notes Escrow Agreement**," and together with the

Jefferies Letters, the "**Debt Financing Agreements**"), pursuant to which the proceeds of the New Satmex Notes Offering and the Debt Financing Obligations will be transferred into the New Satmex Notes Escrow Account.

15. Pursuant to the Debt Financing Agreements, the Debtors are required to fund into escrow an amount which when added to the Net Proceeds Deposit will equal the total fees and expenses of the escrow agent and 100% of the aggregate issue price of the notes plus accrued interest on the notes to, but not including, the 2nd business day following the Escrow End Date. Thus, the Debtors are seeking through this Motion authority to fund the following amounts (collectively, the "**Escrow Obligations**") into the New Satmex Notes Escrow Account upon the closing of the New Satmex Notes Offering: (a) approximately $5.4 million to cover 63 days of interest on the New Satmex Notes in the event of a Special Mandatory Redemption or Special Optional Redemption (each as defined below); (b) up to $10.9 million to fund additional amounts necessary, when added to the Net Proceeds Deposit, to ensure that there are sufficient funds to make the Special Mandatory Redemption or Special Optional Redemption; and (c) approximately $20,000[3] to pay the fees and expenses of the New Satmex Notes Escrow Agent.

16. The Debt Financing Agreements are the result of extensive, arm's-length negotiations between the Debtors, their constituencies and the parties to the Debt Financing Agreements. The fees to be paid under the Debt Financing Agreements are within the range of fees for transactions of similar types and are reasonable under the circumstances. Notably, pursuant to the Jefferies Commitment Letter, the Debt Financing is being provided on a committed basis. Without the influx of cash provided by the Debt Financing, the Debtors will face overwhelming liquidity problems by the end of June 2011 due to two substantial payments

---

[3] It is my understanding that the Debtors are still negotiating the Escrow Agent's fees and expenses and anticipate providing the Court with a revised estimate at the hearing scheduled for April 13, 2011.

that become due pursuant to the Debtors' critical agreements that govern the manufacturing of new satellites.

17. Based on my experience, I believe that the terms of the Debt Financing Agreements are reasonable given the nature, size and complexity of the transactions contemplated thereunder and entering into such agreements are appropriate in light of the value to be received by the Debtors in obtaining the Debt Financing. Additionally, it is my belief that the Debt Financing represents the best debt financing available to the Debtors under the circumstances. Indeed, the financing markets are inherently uncertain and, based on the historic and potential volatility of the high-yield capital markets, I believe that the Debtors would face significant risk in obtaining the Debt Financing on similar or better terms than those already obtained if the Debt Financing Motion was denied.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 12, 2011

J. Blake O'Dowd